JOHN J. SPRIGGS,

*Plaintiff and Appellant,*

vs.

THE CHEYENNE NEWSPAPERS, INC., a Corporation,

*Defendant and Respondent.*

(No. 2349; July 1st, 1947; 182 Pac. (2d) 801)

For the plaintiff and appellant the cause was submitted upon the brief and also oral argument of the appellant, John J. Spriggs of Lander, Wyoming, appearing pro se.

For the defendant and respondent the cause was submitted upon the brief of J. A. Greenwood and Milton D. Nelson of Cheyenne, Wyoming and oral argument by Mr. Greenwood.

## OPINION
### On Motion To Dismiss

PER CURIAM.

The appellant has filed a motion seeking to have this court make an order striking respondent's brief from the files because, as appellant claims, it contains improper material reflecting upon the "character, honor, and rights of the plaintiff and appellant" herein. This motion was argued at the same time the hearing on the merits of this case was had. There was language used by counsel for each of the respective parties which

doubtless could very well have been omitted from their briefs. It did not aid the court in determining the questions presented by the record. It is perhaps possible that some of the language employed in appellant's brief may have provoked what is complained of in this motion made by him. However, we may say that we have not been influenced by any of this material but have disregarded intemperate language wherever found. The reporter of the decisions of this court in reviewing the briefs of both parties will undoubtedly bear in mind and report only the arguments advanced by the parties. Thus improper language will not be preserved. We think, therefore that the appellant's motion should not be sustained and the court deprived of the aid of respondent's counsel's view in the disposition of the case at bar. People ex rel Board of Commissioners vs. Parks, 26 Colo. 322, 57 Pac. 692; Cox et al vs. Aetna Casualty & Surety Co. of Hartford, Conn., 286 Ill. App. 515, 3 N. E. 2d 964; Cox vs. Wood, 247 U. S. 3, 38 Sup. Ct. 421, 62 L. Ed. 947.

## ON THE MERITS

The district court of Laramie County rendered a judgment upon the verdict of a jury against the plaintiff John J. Spriggs and in favor of the defendant, the Cheyenne Newspapers, Inc. The action was one for alleged libel because of the publication of certain Associated Press and United Press dispatches by two newspapers owned and operated by the defendant. The parties hereto will be ordinarily mentioned hereinafter as they were designated in the district court or as appellant and respondent respectively.

The first dispatch published by the defendant was one that appeared in the issue of June 14, 1943 of the Wyoming State Tribune, that newspaper being a daily publication customarily distributed to the public locally

in the afternoon and being one of the two newspapers mentioned above. The dispatch thus printed and published reads as follows:

## "ACTION ASKS DISBARMENT OF SPRIGGS
### Lander Attorney Named in Suit

"Lander, Wyo.— (AP)—The state board of law examiners seeks the disbarment of John J. Spriggs, Lander attorney who sought nomination to run for supreme court justice in the 1942 primary election.

"He was named respondent in an action filed Saturday by the board in Fremont county district court. The proceeding was instituted by Attorney General Louis J. O'Marr at the request of the board, the president and secretary of which, C. A. Zaring, Basin, and L. C. Sampson, Cheyenne, signed the court complaint.

"The complaint charged that during the primary campaign in July, 1942, Spriggs 'prepared and circulated among citizens of Wyoming a mimeographed circular letter containing false and defamatory statements concerning the supreme court of the state of Wyoming' and that 'these acts constitute unprofessional conduct and constitute just and legal cause for revocation of his license to practice law in the state of Wyoming and for his disbarment as a member of the legal profession.'

"Several years ago, two Lander attorneys filed a petition with the state supreme court asking that Spriggs be held in contempt of the court. The petition charged he attributed improper motives to the court justices when he refused to reverse a lower court's decision in a case in which Spriggs was an attorney.

"The court reprimanded Spriggs and dismissed the contempt proceedings."

The matter in this dispatch was also for the most part printed and circulated in the issue of June 15, 1943 of the Wyoming Eagle, the other of defendant's two newspapers. The material for this publication was supplied by the United Press news gathering agency, the material used by the Wyoming State Tribune being furnished by the Associated Press, another well-known news gathering agency. The article in the Wyoming

Eagle did not contain the last two paragraphs set out in the afternoon paper. The Wyoming Eagle is likewise a daily newspaper but customarily was locally distributed to the public each morning.

The second dispatch published by the defendant was one that appeared in the issue of December 29, 1943 of the Wyoming State Tribune, was also furnished by the Associated Press news gathering agency, and reads:

## "DISBARMENT TRIAL URGED
### State Board Pushes Case Against Lander Attorney

"Lander, Wyo.— (AP)—The state board of law examiners today asked the Fremont county district court to bring its case for the disbarment of John J. Spriggs, Lander attorney, to trial."

"The request was contained in a reply to an answer filed by Spriggs to the board's complaint, entered in June by Attorney Gen. L. J. O'Marr, requesting the Lander lawyer's disbarment.

"The complaint charged that during the primary election campaign in July of 1942, Spriggs 'prepared and circulated among citizens of Wyoming a mimeographed circular letter containing false and defamatory statements concerning the supreme court of the state of Wyoming.'

"In his answer to the complaint, Spriggs maintained that the letter in question was a 'privileged political communication' and that as such he had a perfect right to his opinions of deliberations and decisions by the state's highest court.

"District Judge C. D. Murane of Casper is scheduled to hold court here the second week in January and may then set a time when the disbarment case will be heard before a three-judge panel."

Substantially similar material as contained in the foregoing quoted article was also received by the Wyoming Eagle from the United Press and was printed and published by that newspaper under date of December 30, 1943.

Upon these publications in the two newspapers aforesaid plaintiff brought his action, his petition stating two alleged causes of action, the first one being grounded upon their publication of the first article as described above, and the second cause of action upon their publication of the material in the second one hereinbefore set forth. The plaintiff's petition asserted that these published articles were, as regards him, both false and defamatory and damages, both compensatory and punitive, were claimed.

In its answer, the defendant admitted that it published these two articles in the two papers above named but alleged as a defense that the statements in each and both were true and that they were published with good intent and for justifiable ends. Plaintiff's reply put in issue these affirmative defenses.

As already indicated, the cause was tried to the court with a jury in attendance and at the conclusion of the trial, the jury returned a general verdict in the defendant's favor and upon this verdict judgment in accordance therewith was duly rendered and entered. The plaintiff has asked this court for a review of the record by direct appeal. The Constitution of the State of Wyoming in Article I, Section 20 says that:

"Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right; and in all trials for libel, both civil and criminal, the truth, when published with good intent and for justifiable ends, shall be a sufficient defense, the jury having the right to determine the facts and the law, under direction of the court."

Under this fundamental law of the state and the pleadings in this case as we find them, the issues to be tried were then simply (a) whether the statements contained in these published articles were true and (b) whether they were "published with good intent and for justifiable ends".

Before discussing the proofs concerning these controlling issues—for if they were properly and affirmatively established under the Wyoming Constitution, they constitute a complete defense—we may very properly consider some contentions particularly stressed by appellant who is a member of the legal profession in this state and who appeared pro se both in the district court and in this court.

Plaintiff complains that he was not allowed by the trial judge to discuss before the jury the law of the case including the law relative to punitive damages independently of the instructions as to what that law was as set forth in the charge formally given the jury by the judge upon the close of the evidence submitted by both parties. In other words, plaintiff insists that he was entitled to argue either his own views or the views of others concerning the law under which the case should be decided entirely apart from what the court stated the law of this state in fact was. This brings up for consideration the effect to be given that clause in Article I, Section 20 of the Wyoming State Constitution, supra, which declares "the jury having the right to determine the facts and the law *under the direction of the court*". (Italics supplied)

In Nicholson vs. State, 24 Wyo. 347, 157 Pac. 1013, this court said concerning this clause:

"To our minds this language clearly means that the court should instruct the jury as to the law. This provision, that in action for libel the jury shall have the right to determine the facts and the law, found in our Constitution and in the constitutions or statutes of other states, grew out of the practice in England as modified by what is known as the Fox Libel Act. Prior to that Act in prosecutions for libel the verdict of the jury was special. The only question submitted to the jury being whether the alleged libel had been published; and whether the language supported the innuendo. The question of libel or no libel was determined by the

court. By the Fox Act the jury was authorized to return a general verdict of guilty, or not guilty, as in other criminal cases, and thus decide the question of libel or no libel, formerly decided by the court."

Preceding the language just set forth appears an instruction given by the trial court in that case in which the jury were advised, after the provisions of Article I, Section 20, supra, were laid before it, that they were "the sole judges of the law and the facts upon every proposition involved in this case" and also in substance that if they could say on their oaths that the court was wrong "in its exposition of the law, the Constitution has given them that right". In view of the judicial history of this and other like provisions in other state constitutions as an outgrowth of English and early American law concerning the subject of criminal libel, we are inclined to doubt the correctness of these quoted statements from this instruction. This language is taken, as this court pointed out, from an instruction given in People vs. Seeley, 139 Cal. 118, 72 Pac. 834. But the California constitution (Article I, Section 9) provided only "the jury shall have the right to determine the law and the fact". Nothing is said in that constitution, as appears in ours, to the effect that this shall be done "under the direction of the court". Also an instruction to the same effect was approved in State vs. Heacock, 106 Ia. 191, 76 N. W. 654. But the Iowa statutory law (Section 4102, Code 1873) reads simply: "The jury, after having received the direction of the court, shall have the right to determine at its discretion, the law and the fact". Section 4438 provided that "on the trial of an indictment for a libel, the jury have the right to determine the law and the fact". Iowa has no constitutional provision like ours. It is manifest that these differences of statutory and constitutional law in the two states last mentioned from the phraseology employed in Article I, Section 20, supra, of the

Wyoming Constitution, do not aid in the construction of our own fundamental charter giving the right to the jury to determine the law "under the direction of the court".

The Nicholson case was undoubtedly correctly decided and the instruction as given could hardly be regarded as prejudicial to the defendant especially as the jury evidently did not disregard the court's general charge.

Immediately following the language whcih we quoted above from the court's opinion reference is made to the case of Oakes vs. State 98 Miss. 80, 54 So. 79, and Sparf and Hansen vs. United States, 156 U. S. 51, 15 Sup. Ct. 273, 39 L. Ed. 343 as cases to be considered by those who desired to investigate this matter further.

The Oakes case was a case of alleged criminal libel under a constitutional provision (Sec. 13, Miss. Constitution of 1890) which used this language:

"The freedom of speech and of the press shall be held sacred; and in all prosecutions for libel the truth may be given in evidence; and the jury shall determine the law and the facts under the direction of the court; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted."

Error was assigned that the trial court charged the jury:

"that all the law to be considered by them in reaching a verdict in the case is contained in the written instructions given by the court, and upon these instructions and the evidence alone should their verdict be made".

and also that during the argument of the case appellant's counsel attempted to read to the jury from certain law books dealing with the law of libel but was stopped by the court from so doing upon objection

interposed by the State. Holding that there was no error, the court in its opinion gave a very complete and clear discussion of the historical background out of which the constitutional provision quoted above issued, and the consequent enactment of the Fox Libel Act in 1792 (Ch. 60 of 32 Geo. III) by the English Parliament, and the transplanting of its provisions into American law as a result of the celebrated libel case of People vs. Croswell, 3 John. Cas. (N. Y.) 365 where Alexander Hamilton's great argument and the lucid opinion of Chancellor Kent led to the adoption of the 1804 New York law on the subject. That statute provided after its enacting clause:

"That on every such indictment or information, the jury who shall have a right to determine the law and the fact, under the direction of the court, in like manner as in other criminal cases, and shall not be directed or required by the court or judge, before whom such indictment or information shall be tried, to find the defendant guilty, merely on proof of the publication by the defendant of the matter charged to be libelous, and of the sense ascribed thereto in such indictment or information: Provided, nevertheless, that nothing herein contained shall be held or taken to impair or destroy the right and privilege of the defendant to apply to the court to have the judgment arrested, as hath heretofore been practiced. 2. That in every prosecution for writing or publishing any libel, it shall be lawful for the defendant, upon the trial of the cause, to give in evidence, in his defense, the truth of the matter contained in the publication charged as libelous: Provided, always, that such evidence shall not be a justification, unless, on the trial, it shall be further made satisfactorily to appear, that the matter charged as libelous was published with good motives and for justifiable ends."

Thereafter the Mississippi court cogently says referring to Hamilton's contention for the right of juries in criminal libel cases to render a verdict as broad as

the issue involved and Judge Kent's concurrence therein that:

"Since the controversy centered around the rights of juries to render a general verdict in libel cases, as broad and comprehensive as such a verdict is in all other criminal cases, the conclusion is irresistible that its adoption was for the purpose of settling the right of juries so to do, and not to confer upon them the right to determine the law for themselves without the assistance, or against the direction, of the court. Indeed, any doubt on this point ought to be removed by the language of the Constitution itself, for it does not simply provide that the jury shall determine the law and the facts, but provides that it shall do this 'under the direction of the court'."

citing many cases, including Sparf vs. United States, supra. Concluding this discussion of the point, the court further very logically reasoned as we think:

"If juries have the right to determine the law of libel for themselves, free from the control of the court, the result would be not only that the law would be uncertain because of the different views which different juries might take of it, but their judgment of the law, however erroneous, would be final; for in that event, neither the trial court nor this court would have any right to review same, and could grant no relief to a defendant, however erroneously he may have been convicted. The court would have no right to decide any question of law which might arise on the trial, by demurrer or otherwise. Should a citizen, under this construction of the Constitution, be indicted for libel, and the matter charged to be such be never so harmless or lawful, the court would be powerless to prevent his conviction and punishment, should the jury decide that, in its judgment, the matter charged was libelous. The jury would be the judge of the meaning of the Constitution and statutes, whether statutes were valid, what the common law is, what the law of privilege is—in short, of all questions of law which would arise on the trial. We are aware that those courts which have construed similar constitutional provisions in accordance with appellant's contention deny that this

result follows therefrom; but in doing so they have involved themselves in all sorts of absurdities by attempting to limit the right of juries to determine the law for themselves, when, if the Constitution confers such a right, it confers it without limit. Our view of the result of such an interpretation of this provision of the Constitution is sanctioned by the great name of Story in U. S. v. Battiste, 2 Summ. 240, Fed. Cas., No. 14,545, and by the Supreme Court of the United States in Sparf v. U. S., supra. It is true these were not libel cases; but it will not be questioned that the principles therein announced apply to such cases. It follows, from the foregoing views, that the court committed no error in granting the instruction now under consideration, neither did the court err in refusing to permit counsel to read law books to the jury. Ayers v. State, 60 Miss. 709; Bangs v. State, 61 Miss. 363."

Article II of Section 10 of the Constitution of Colorado provides:

"No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact."

Under this language the court in Meeker vs. Post Printing and Publishing Company, 55 Colo. 355, 135 Pac. 457 remarked:

"While it is true that the Constitution of this state provides that the jury, in libelous cases, shall determine the law and the facts, this does not eliminate the requirements that the issues be made up and the same procedure followed as in other cases, and that the rules of evidence be likewise thus followed. Article 2, § 10, Colorado Constitution. This position is not seriously controverted;"

The decision of the Supreme Court of the United States in Sparf vs. United States, supra, referred to in the Nicholson case cited above, was delivered by Mr.

Justice Harlan. While the Sparf case was not a libel action, yet the principles announced therein are very worthy of consideration here. Holding that it was the duty of juries in criminal cases to take the law from the court and apply that law to the facts as they find them to be from the evidence, this was said:

"Indeed, if a jury may rightfully disregard the direction of the court in matter of law, and determine for themselves what the law is in the particular case before them, it is difficult to perceive any legal ground upon which a verdict of conviction can be set aside by the court as being against law. If it be the function of the jury to decide the law as well as the facts—if the function of the court be only advisory as to the law— why should the court interfere for the protection of the accused against what it deems an error of the jury in matter of law?

"Public and private safety alike would be in peril, if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court and become a law unto themselves. Under such a system, the principal function of the judge would be to preside and keep order while jurymen, untrained in the law, would determine questions affecting life, liberty, or property according to such legal principles as in their judgment were applicable to the particular case being tried. If because, generally speaking, it is the function of the jury to determine the guilt or innocence of the accused according to the evidence, of the truth or weight of which they are to judge, the court should be held bound to instruct them upon a point in respect to which there was no evidence whatever, or to forbear stating what the law is upon a given state of facts, the result would be that the enforcement of the law against criminals and the protection of citizens against unjust and groundless prosecutions, would depend entirely upon juries uncontrolled by any settled, fixed, legal principles. And if it be true that a jury in a criminal case are under no legal obligation to take the law from the court, and may determine for themselves what the law is, it necessarily results that counsel for the accused may, of right, in the presence of both court and jury, contend

that what the court declares to be the law applicable to the case in hand is not the law, and, in support of his contention, read to the jury the reports of adjudged cases and the views of elementary writers."

Section 14 of Article II of the Constitution of Missouri reads:

"That no law shall be passed impairing the freedom of speech; that every person shall be free to say, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact."

In Heller vs. Pulitzer Publishing Company, 153 Missouri 205, 54 S. W. 457, it was insisted, as in the Oakes case supra, that if the jury are the judges of the law in a libel case, that counsel had the right to read law books to the jury in such an action. But the Supreme Court of Missouri thought otherwise, saying:

"We are of opinion, however, that as under Fox's Act the court or judge was expressly given the right to 'give their or his opinion or direction to the jury on the matter in issue between the King and defendant, or defendants, in like manner as in other criminal cases,' so under our Bill of Rights it is the province of the court to give directions to the jury, that is, to define in general terms the law of libel, but not to command a verdict for the plaintiff, and as by section 2188, Revised Statutes 1889" (cf. Wyoming Revised Statutes 1931, Section 89-1306; Wyoming Compiled Statutes 1945, Section 3-2408) "the court is charged with the duty in civil cases of giving, in writing, all the instructions covering the law applicable to the matters in issue, which the parties ask and the court thinks proper, or which the court may give of its own motion. It was never intended by the framers of our Constitution in adopting the Fox Act, to permit the practice of getting the law before the jury in any other manner than by instructions asked of and given by the court (Sparf v. U. S., 156 U. S. 51). Allowing counsel to read law books

to the jury would not only tend to confuse the jury, but might present the unseemly spectacle of counsel trying to convince the jury, by what some author says, whose ideas are not followed in this State, or by some decision of a court of some other State where the adjudications are not in accord with ours, that the directions of the court were not the law; and thus the due and orderly administration of justice, so necessary to be observed, would be turned into a farce and perhaps an insult to the judge of the trial court."

In Jones vs. Murray, 167 Missouri 25, 66 S. W. 981, a later case involving the law of libel in the same jurisdiction, it was suggested, very appropriately it would seem, that:

"because of the character and scope of the various excusatory and mitigating pleas that may be interposed, it is the more necessary that the court should properly and carefully advise the jury as to the law. Heller v. Publishing Co., 153 Mo., loc. cit. 215, 54 S. W. 457. And when the trial court errs in so doing it is necessary to the protection of the rights of the citizen, and to the proper administration of the law, that this court should correct the error."

To the same effect the same court still later decided in Cook vs. Globe Printing Company, 227 Mo. 471, 127 S. W. 332 that the Missouri constitutional provision quoted above would not curtail the power of the court to grant a new trial in a libel action when the administration of justice so required. In thus deciding we find the court using this language:

"Numerous other cases might be cited to show that this provision of the Fox act and of our Bill of Rights and statute, passed in pursuance thereof, have been interpreted to mean no more than that, on the main issue of libel or no libel, the jury are the judges both of the law and the fact, and that in all other respects it was never the intention of the Parliament of England, nor of the people of this state in incorporating the Fox act into our Constitution, to deprive the court, as such, of its powers in every other respect. Indeed the language

of our Constitution emphasizes that the court should assert its authority as such in directing the jury, and we have been unable to find anywhere in the English cases, or in any court of last resort in this country, that the court has been deprived of its power to grant a new trial in a libel case any more than in any other character of suit, nor in our opinion is there any reason why the court should be shorn of this great, conservative principle and power in a libel suit any more than in any other sort of action. In the examination of libel cases many applications for new trials on the ground of excessive damages will be found collated by Odgers on Libel and Slander, p. 656, in which the courts have considered whether the verdict was excessive or too small, and granted or refused the same upon well-settled legal principles, without any suggestions whatever that the courts were without jurisdiction to grant the same in a proper case and on reasonable grounds. Our conclusion, then, is that the provision of our Constitution 'that in all suits and prosecutions for libel, the truth thereof may be given in evidence and the jury under the direction of the court, shall determine the law and the fact', does not deprive the courts of their power to grant new trials in a libel suit on the ground that the verdict is excessive, or for any other recognized legal ground."

In Montgomery vs. State, 11 Ohio, 424, relative to the Ohio constitutional provision concerning the law of libel in force when that case was tried, the Supreme Court of Ohio said:

"By the last clause of section 6 of Article 8 of the constitution of this state, it is declared that 'in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases'. It would seem, from this, that the framers of our bill of rights did not imagine that juries were rightfully judges of law and fact in criminal cases, independently of the directions of courts. Their right to judge of the law, is a right to be exercised only under the direction of the court; and, if they go aside from that direction, and determine the law incorrectly, they depart from their duty, and com-

mit a public wrong; and this in criminal, as well as in civil cases."

Judge Cooley in 2 Constitutional Limitations (8th Ed.) 955, speaking of the duties of judge and jury in libel cases says this:

"Nevertheless, we conceive it to be proper, and indeed the duty of the judge, to instruct the jury upon the law in these cases, and it is to be expected that they will generally adopt and follow his opinion.

"Where, however, the constitution provides that they shall be judges of the law 'as in other cases,' or may determine the law and the fact 'under the direction of the court,' we must perhaps conclude that the intention has been simply to put libel cases on the same footing with any other criminal prosecutions, and that the jury will be expected to receive the law from the court."

See also note appended to the case of Albert Miller and Company vs. Corte, 107 Fed. 2d, 432, 435.

We readily conclude under the reasoning of these authorities that the district court was quite correct and did not err in declining to allow appellant to discuss the law of the case independently of the instructions given by the court to the jury for their guidance.

Complaint is made by appellant that certain depositions were not received in evidence for the court. These depositions were given by sundry residents of Lander, Wyoming where appellant resides and were apparently offered to show that appellant's reputation in that community for "truth, honesty and veracity" and "uprightness" was good. In excluding the depositions, it was stated by the court that plaintiff was assumed to have a good reputation and that it had not been attacked at the time the offer was made. For several reasons this complaint is without merit. Evidence of this character had nothing whatever to do with the issue of whether the published articles were true or whether they were published with good intent for justifiable

ends. The depositions could in any view be concerned only with the question of damages and as it is apparent that the jury determined the controlling issues mentioned against plaintiff, he could not have been prejudiced by excluding the testimony in question. It may be noted also that no exception was taken by plaintiff to the court's ruling on the offer of these depositions in evidence.

It appears that the trial court directed that the several exhibits received in evidence on behalf of each party should not be read at the time they were so admitted but could and should be read when all were introduced and before each party rested his case. Evidently this was with the idea of not submitting them to the jury piecemeal and as they were quite voluminous that there would result thereby some saving of time. Counsel were, nevertheless, permitted to read their exhibits to the jury during the course of their arguments before it and both appear to have done that. At any rate these matters were under the control of the court in the exercise of a sound discretion and no abuse of that discretion appears. We fail to see that appellant was in any way prejudiced by the procedure thus adopted by the trial judge. It would seem to be the rule that as said by the court in State vs. Driver, 88 W. Va. 479, 107 S. E. 189:

"The trial court's discretion in the mode of conducting trials and the order and time of introducing evidence will not be disturbed, unless grossly abused. McManus v. Mason, 43 W. Va. 196, 27 S. E. 293; Goodwin v. Tony Pocahontas Coal Co. —— W. Va. ——, 106 S. E. 76; Philadelphia & T. R. Co. v. Stimpson, 14 Pet. 463, 10 L. Ed. 535; Smith v. Mayer, 3 Colo. 210; and Godbe v. Young, 1 Utah 57."

See also 53 American Jurisprudence p. 103, Section 116.

The contention is made that there was error because the trial court limited counsel for the parties to thirty minutes for each side in presenting their respective arguments to the jury. The issues involved in the case were few and very simple. The court at that time had instructed the jury that "the evidence of the truth of the two articles published is uncontradicted". That left to be argued but the two questions, viz.: Were they published with "good intent and for justifiable ends"? But four witnesses testified in the case and only small portions of their testimony dealt with these matters. The documentary evidence in the case which threw light upon these issues was likewise not extended. The rule is as stated in 3 American Jurisprudence 534, Section 973 and appended cases:

"limiting the time to be used by counsel in argument is within the sound discretion of the trial court, which is not subject to review by a higher tribunal unless abused."

See also to the same effect 53 American Jurisprudence 364, Section 461 and cases there cited. We perceive no clear case of abuse of discretion on the part of the trial court in connection with the matter.

Error is assigned because the district court overruled plaintiff's motion for a new trial. But the statute (Section 3-3403 Wyoming Compiled Statutes 1945; Section 89-2103, Wyoming Revised Statutes, 1931) directs that: "A motion in writing for a new trial must be made within ten (10) days after the verdict, report, or decision is entered; unless such party is unavoidably prevented from filing the same within such time". The record before us shows that the verdict was entered on the same day it was rendered, viz. Feb. 4, 1946. The motion for a new trial was not filed until Feb. 20, 1946, i. e., six days after it should have been on file. No excuse for not filing the paper in time is suggested. The

court was quite within its rights in overruling the motion. Markward and Niman vs. Doriat, 21 Ohio St. 637; McKinney vs. State, 3 Wyo. 719, 30 Pac. 293. Besides, under the law governing direct appeal procedure, specifications of error are in effect substituted for a motion for a new trial. The statute providing for direct appeals makes no provision for such a motion. It is difficult to see too that prejudicial error to appellant resulted as a consequence of the court's action in overruling the motion for a new trial even if it had been filed in time inasmuch as practically the same grounds appeared later in appellant's specifications of error and upon which the court was duly notified to act as the direct appeal law commands.

It is urged that the court erred in giving to the jury instruction No. 4 which was set forth in these words: "In this case the evidence of the truth of the two articles published is uncontradicted. They are therefore, to be considered by you in your deliberations in this case as true.

"Were they published with good intent and for justifiable ends? The Constitutional provision just read from says every person may freely speak, write and publish all subjects being responsible for the abuse of that right and that the truth when published with good intent and for justifiable ends shall be a sufficient defense.

"Because our judiciary is a vital part of your system of Government and an attorney at law is an officer of the court, his conduct toward the courts is a matter of legitimate public interest and concern and may properly be given publicity through newspaper accounts.

"In determining this question of good intent and justifiable ends you may take into consideration whether the articles were a fair statement of what happened, the manner in which they were written, whether the events mentioned were news, together with all the facts and circumstances in the case."

Concerning the truth of the two articles as dealt with in the first two sentences of the instruction just

quoted: Plaintiff himself offered in evidence, and it was received without objection, certified copy of the complaint filed in and presented to the district court of Fremont County by the State Board of Law Examiners, June 11, 1943 against John J. Spriggs, the appellant in the case at bar. Upon examination, this complaint disclosed that it was signed by C. A. Zaring as President and L. C. Sampson as Secretary of the State Board aforesaid and was verified by Louis J. O'Marr, the Attorney General of the State of Wyoming; that in this verification the officer last mentioned stated that "at the request of the State Board of Law Examiners of the State of Wyoming and as said Attorney General he makes the foregoing complaint; that he has read said complaint and knows the contents thereof and that the facts alleged are true as he is informed and verily believes."; that the complaint thus signed and sworn to charged, to quote its language: "That during the month of July, 1942, the said respondent prepared and caused to be circulated among the citizens of the State of Wyoming, in envelopes bearing his return address, a mimeographed circular letter; that said mimeographed circular letter so prepared and circulated by the respondent contains false and defamatory statements concerning the Supreme Court of the State of Wyoming"; and also: "That the acts of said respondent John J. Spriggs in so preparing and circulating said mimeographed letter constitute unprofessional conduct upon his part and constitute just and legal cause for the revocation of his license to practice law in the State of Wyoming and for his disbarment as a member of the legal profession."

It will be observed that the charges thus made are practically verbatim statements with the two articles as printed and published by the two newspapers owned and operated by the defendant. The article in the Wyoming Eagle as has been already indicated is some-

what shorter than that appearing in the Wyoming State Tribune. It is perfectly plain that neither publication contained any comments on the material contained in the complaint nor did they even hint that the charges made by the State Board of Law Examiners were true. They merely published that these charges had been made in the complaint filed, which was the undeniable truth. This was entirely aside from the fact which also appears in the record at bar, that the district court of Fremont County, three judges sitting, afterwards found that the letter referred to in the published article in the two newspapers dated respectively June 14, 1943 in the Wyoming State Tribune and June 15, 1943 in the Wyoming Eagle, and as charged in the complaint of the State Board of Law Examiners, contained:

"false statements and innuendos and implications defamatory of and derogatory to the Supreme Court of the State of Wyoming and which were designed to bring and have the effect of bringing said Court into disrespect among the citizens of the State.

"That said letter in effect and by implication falsely charges the Supreme Court of this State with corruption, bias, prejudice and incompetency.

"That the acts of the said John J. Spriggs in so preparing and circulating said letter constitutes a willful violation by him of his duties as an attorney at law of the State of Wyoming and are a just and legal cause for the revocation or suspension of his license as an attorney at law of this State."

These findings were afterwards quoted and affirmed by this court, other judges sitting in the stead of the three justices legally elected as members of the court. State Board of Law Examiners vs. Spriggs, 61 Wyo. 70, 155 Pac. 2d 285.

The answer of John J. Spriggs in the disbarment proceeding was offered in evidence by the plaintiff and,

like the complaint aforesaid in that matter, was without objection received and appears in the present record.

Relative to the article published in said newspapers, in the Wyoming State Tribune under date of December 29, 1943 and the Wyoming Eagle of December 30, 1943, the answer thus in evidence here shows that the statements in these December publications as to the purport of said answer were quite in accord with the claims made by Mr. Spriggs therein. The reply which was filed in this same disbarment proceeding and received in evidence upon the offer of the defendant with the approval of the plaintiff establishes as stated in said last mentioned publications that thereby the State Board of Law Examiners prayed "that a hearing be had upon the complaint herein".

Plaintiff also offered in evidence—and they were received without objection—sundry papers and orders of this court relative to certain contempt proceedings in said court, instituted in Case No. 1978, Barney N. Tibbals and John J. Spriggs, plaintiffs and appellants, vs. Marshall Graham as receiver, etc. duly certified by the clerk of this court. The final order in the matter dated November 23, 1937 recites that John J. Spriggs, an attorney of this court had previously presented to the court a petition designated 'petition for mandamus'; that Messrs. Harnsberger and Dobler as amici curiae suggested to the court that the language of that petition was contemptuous and that the said John J. Spriggs should be cited to show cause why he should not be punished for contempt; that such a citation was issued and a hearing had thereon on November 9, 1937 and that matter was taken under advisement; that the court found, to quote the remaining language of the order verbatim:

"that the said John J. Spriggs was not justified in filing the petition above mentioned, and that the lang-

uage used therein is offensive, disrecpectful to and contemptuous of this court, which should not be used by an officer of this court, and proper punishment should be meted out therefor,

"But whereas the said John J. Spriggs, at the oral hearing of the matter, withdrew his said petition and apologized to the court, and whereas, since that time, he has also filed a written apology and retraction for presenting his petition as above mentioned, and has assured this court that in the future he would scrupulously and carefully refrain from any procedure or the use of language which would be improper or offensive, and whereas this court now believes that the said apology and retraction has been made in good faith, and that said John J. Spriggs will in the future refrain from offensive conduct, and believing that under the peculiar circumstances of this case a reprimand is sufficient punishment.

"It is accordingly adjudged that the said John J. Spriggs, be, and he is hereby, reprimanded for his unwarranted conduct and for the offensive language employed by him in the matter as aforesaid, and

"It is further ordered that the said apology and retraction, under the reprimand aforesaid, be accepted by this court, and that the order to show cause be vacated and the contempt proceeding dismissed, without intending, however, to allow the court's action herein to serve as a precedent for thus leniently dealing with an officer of this court for using like or similar language before this court in the future."

It is clear from the terms of this order and the other papers in evidence with it that the last two paragraphs of the article published in the Wyoming State Tribune on June 14, 1943 were true. Under the proof submitted by the appellant himself, the trial court was consequently correct in advising the jury in instruction No. 4 that the two published articles in each of the newspapers aforesaid were to be considered by them "as true".

The only question remaining to be examined is whether these articles were published "with good intent and for justifiable ends".

In the case of State Board of Law Examiners of Wyoming vs. Brown, 53 Wyo. 42, 77 Pac. 2d 626 this court in discussing the nature of a disbarment proceeding said:

"Disbarment proceedings are not exactly either criminal or civil in nature, but partake of the character of special proceedings, disciplinary and summary in form, necessarily incident to the inherent power of courts to control properly their own affairs. They are not litigation between adverse parties, but simply the exercise of jurisdiction over an official whose authority to serve the public and the courts issues out of the courts themselves. Such proceedings cause an inquiry into his conduct not for the purpose of applying a remedy for a wrong done, but only for the maintenance of the purity and dignity of the courts, by removing an officer whose fitness to function has been questioned and whose unfitness shall be established. When they result in disbarment ,the official affected is, of course, punished thereby, but the intrinsic nature of *the whole matter involves a determination in the public interest* whether the person whose conduct is the subject of the inquiry should be permitted to practice the profession of law." (Italics supplied)

Such matters are in the nature of in rem proceedings to determine the status of an officer of the court and are binding on the officer involved and all others in this jurisdiction and elsewhere. Re Thomas v. Craven, 151 So. (La.) 625; Re Craven 169 La. 555, 125 So. 591; in Re Ryan, 229 Ia. 339, 294 N. W. 566; Louisiana State Bar Association vs. Steiner, 207 La. 407, 21 So. 2d 426; 31 Am. Juris. 98, § 441, and cases cited.

In Hyatt vs. Hamilton County, 121 Ia. 292, 96 N. W. 855, the court speaking through Judge McClain pointed out that:

"The disbarment of persons who have been admitted to the practice of law, but have by misconduct forfeited the right to pursue the profession, is as much a matter of public concern as the defense of those who are charged with crime. A disbarment proceeding is not primarily in the interest of members of the legal profession, but in interest of those who, desiring to have the services of an attorney, may be misled to their injury, or defrauded, in employing a disqualified or dishonest attorney, by reason of the action of the state in admitting him to practice, and thereby impliedly indorsing him as one to whom legal business may properly be intrusted."

And the supreme judicial court of Massachusetts in Re Keenan 287 Mass. 577, 192 N. E. 65 has similarly said:

"The primary purpose of such a proceeding is the preservation of the purity of the courts and the protection of the public from attorneys who disregard their oath of office and have been proved unworthy of trust. An attorney is not merely practicing a profession for personal gain; he is an officer of the court. By virtue of its inherent power to control the conduct of its affairs, to maintain its dignity and to enable itself to do justice the court has a summary jurisdiction to inquire into the conduct of its officers and to deal with an attorney found to have committed any evil practice contrary to justice and honesty."

\* \* \* \* \* \*

"Disbarment is not an adversary proceeding in the strict sense. There is no party plaintiff with a private interest. Bar Association of Boston v. Case, 211 Mass. 187, 97 N. E. 751, 39 L. R. A. (N. S.) 116, Ann. Cas. 1913A, 1226. A disbarment proceeding is an inquest or an inquiry into the conduct of the attorney. It is the pursuit of a right as well as the performance of a duty by or in behalf of the court to purge its officers of an unworthy member. It involves no private interest except that of the attorney. It is the invocation of a remedy to protect the courts and the public from the impositions arising from the presence of an unfit person among trusted officers. It does not afford redress

for a private grievance. It is an action undertaken and carried forward solely for the public welfare."

The language in Article I, Section 20, supra, "published with good intent and justifiable ends" though it appears substantially in many other state constitutions with the substitution of the word "motives" for the word "intent" does not seem to have been construed or analyzed by the adjudicated cases perhaps because it was regarded as unnecessary. However, it may not be amiss to make a few observations concerning it. These words which require more than the mere truth of the published article to be established in evidence, appear to have been first used by Alexander Hamilton in his argument in the case of People vs. Croswell, supra, (3 John. Cas., 337, 360), the first paragraph of his recapitulation of the substance of his contentions reading:

"The liberty of the press consists in the right to publish, with impunity, truth, with good motives, for justifiable ends, though reflecting on government, magistracy, or individuals."

These words were also given the approval of Chancellor Kent in his opinion in that case (p. 394).

The reason for qualifying the truth only as a defense to the charge of libel, was stated by Lord Brougham in his testimony before the House of Lord's Committee on Libel in 1843 in these words:

"I am quite clear that the truth ought not to be made decisive in either civil or criminal proceedings, for cases may be put where the truth instead of being a justification, would not even be any mitigation, nay where it would be an aggravation."

Many other lawyers and judges gave opinions to like effect when called before this committee. That body after careful and exhaustive research and examination of testimony received, recommended to the House of

Lords (Report of the House of Lords Committee on Libel, July 1943) that in criminal cases that the truth be made a good plea if it was published for the benefit of the community and in civil cases they recommended the same. The Committee's advice was taken only as to criminal cases in the English Libel Act of 1843. It is perhaps regrettable that they did not take the advice of the Committee in full. That body evidently realized that great hardship was often caused by raking up some forgotten sin of the past at a time when a man had turned over a new leaf and was leading a respectable life.

It seems well stated therefore that:

"The truth needlessly or maliciously published does no social good, but often considerable harm to the individual right to reputation. To state that one *is* a criminal because he had years before served time in prison following his conviction as an embezzler would hardly be true even though the individual had been so convicted and imprisoned. That debt to society had been paid and it is conceivable that the individual had lived a clean, useful life for many years following his incarceration; the criminal charge against him had been absolved. To publish needlessly that because of an early mistake the man is a criminal or to infer that he *is* a criminal would be stretching the truth and might well be libelous, though the newspaper might offer in evidence the record of his earlier offense against society." Thayer's Legal Control of the Press, p. 289.

Passing to a brief examination of the language "with good intent and for justifiable ends" (Constitution of Wyoming, Article I, Section 20) we find this court saying in First National Bank vs. Swan, 3 Wyo. 356, 23 Pac. 743 that:

"An intent—that is, a purpose, an aim, a design—is, in jurisprudence, whatever may be said of it in metaphysics, as much a fact as is a physical act performed. The one is the exertion of the power of the mind; the other, the exertion of the power of the body."

So in Edie vs. Coleman 235 Mo. App. 1289, 141 S. W. 2d 238, the court declared that:

"'The intent of a person cannot be proven by direct and positive evidence. It is a question of fact, to be proven, like any other fact, by acts, conduct, and circumstances'. People v. Johnson, 131 Cal. 511, 514, 63 P. 842, 843."

See also Mundt vs. Mallon, 106 Mont. 242, 76 Pac. 2d 326, 328, 329.

The Century Dictionary defines "end" as the "ultimate object"; the Standard Dictionary, as "the purpose in view" and the same lexicons define "justifiable" as "warrantable", "defensible". We may take it then that the clause in question means that the matter must be published with a good purpose and for a defensible ultimate object and these are facts to be proven as any other fact of like nature in a litigated case.

Taking the testimony of defendant's witnesses pertinent to the issues as true as we should where the jury has found in favor of that party and specifications of error are presented that the judgment of the district court was not sustained by sufficient evidence and that it was contrary to law (See Dulaney et al vs. Jensen, 63 Wyo. 313, 181 Pac. 2d 605, and cases there cited, recently decided by this court) we find that the news editor of the Wyoming State Tribune on the witness stand told the court and jury the article printed in the June 14, 1943 issue of that paper and involved in the action at bar was received by him from the Associated Press, a reliable news gathering agency, in the ordinary and general form he daily received news; that he determined that the article had "spot news value", i.e., that the public would not know of it prior to reading it in the paper; that at the time he printed the article he did not personally know Mr. Spriggs; that this story which came to his desk regarding an attorney

was one which he thought people were entitled to know; that in authorizing the article to be published in the paper he had no malicious intent in mind; that the same facts were true as regards the publication of the article herein involved under date of December 29, 1943 in the same newspaper.

The news editor of the Wyoming Eagle as a witness for the defendant stated that the article printed in that paper on June 15, was received by him from the United Press news gathering agency; that to his knowledge no one in the Wyoming Eagle news department knew Mr. Spriggs personally at that time; that the article was published as a news item, one that the public would be interested in just as any news item; that there was no purpose or intention to exhibit malice towards Mr. Spriggs by the contents of the publication; that the foregoing statements were also true of the article in question published in the Wyoming Eagle on December 30, 1943; that there was no intent to injure the plaintiff by this publication.

It does not appear that the foregoing testimony on behalf of the defendant was contradicted but if so the jury concluded evidently that these statements were to be believed and so decided. The testimony afforded substantial evidence tending to establish that in addition to being true the published articles in question here were published with good intent and for justifiable ends. The general public is entitled to know when an attorney becomes involved in a disbarment proceeding, such a proceeding being one definitely for the welfare of the citizens of the state as an entirety in accord with the authorities heretofore reviewed. The publication of information in aid of the public welfare and in its interest can unquestionably be regarded as done for "a good purpose" and for a "defensible ultimate object". The proceedings to call members of the bar to

account for their misbehavior towards the court or their clients are not lightly instituted but only after careful investigation and upon considered grounds. It is of the highest importance that the public should know when attorneys, as officers of the court, are charged with disloyalty thereto. It is only through the possession of such knowledge that the people can intelligently deal with the members of the legal profession and intrust business to them.

We think accordingly that the jury reached correct conclusions on the facts submitted to them in this case and that they did not misapply the law as given them by the court and which should control the disposition of the entire case.

A number of other contentions have been urged by the appellant. We have examined them all and find them without merit. Those most especially stressed on his behalf have been discussed at length above. To give a detailed review of every point advanced by appellant and seemingly urged because the ruling was adverse to him, would be to extend this opinion to an unwarranted length. Our conclusion upon the entire case after devoting a careful and painstaking examination to the record herein, taken in conjunction with the briefs and arguments of counsel thereon, is that the judgment as entered should be in all things affirmed and accordingly an order to that effect will be made.

*Affirmed.*