Gerry L. SPENCE and the Spence Foundation for People's Attorneys, Inc., Appellants (Plaintiffs) Cross–Appellees,

v.

Larry FLYNT; Althea Flynt; L.F.P., Inc., a California corporation; Larry Flynt Publications; Hustler Magazine, Inc., a California corporation; Flynt Distributing Company, a California corporation; Flynt Subscription Company, a Nevada corporation; LFZ, Ltd., a B.W.I. corporation; Island Distributing, Inc., a B.W.I. corporation; David Kahn; Jim Goode, Doug Oliver; N. Morgen Hagen; Lonn M. Friend; Inland Empire Periodicals, an Oregon corporation; and Park Place Market, Inc., a Wyoming corporation, Appellees (Defendants) Cross–Appellants.

Larry FLYNT; Althea Flynt; L.F.P., Inc., a California corporation; Larry Flynt Publications; Hustler Magazine, Inc., a California corporation; Flynt Distributing Company, a California corporation; Flynt Subscription Company, a Nevada corporation; LFZ, Ltd., a B.W.I. corporation; Island Distributing, Inc., a B.W.I. corporation; David Kahn; Jim Goode, Doug Oliver; N. Morgen Hagen; Lonn M. Friend; Inland Empire Periodicals, an Oregon corporation; and Park Place Market, Inc., a Wyoming corporation, Appellants (Defendants) Cross–Appellees.

v.

Gerry L. SPENCE and the Spence Foundation for People's Attorneys, Inc., Appellees (Plaintiffs) Cross–Appellants.

Nos. 89–17, 89–18.

Supreme Court of Wyoming.

Aug. 8, 1991.

Petition for Rehearing Denied Sept. 16, 1991.

Gerry L. Spence and Gary L. Shockey, argued, of Spence, Moriarity & Schuster, Jackson, for appellants.

Alan L. Isaacman, argued, David O. Carson, and Kirk N. Sullivan of Cooper, Epstein & Hurewitz, Beverly Hills, Cal., and Paul Godfrey and George E. Powers of Godfrey and Sundahl, Cheyenne, for appellees.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

CARDINE, Justice.

Gerry Spence, appellant, undertook to represent Andrea Dworkin in her litigation against *Hustler Magazine* (Hustler). Because he undertook to represent this client, he was personally attacked by Hustler by being named "Asshole of the Month." Spence is a lawyer. Lawyers named "Asshole of the Month," such as Spence, are "vermin-infested turd dispensers," "parasitic scum-suckers," "shameless shitholes (whose main allegiance is to money) [who] are eager to sell out their personal values, truth, justice and our hard-won freedoms for a chance to fatten their wallets." Spence, a "hemorrhoidal type," was "Asshole of the Month for July" in 1985. Hustler claimed members of Spence's firm were potential witnesses and moved to disqualify them from representing him in this litigation. The district court denied Hustler's motion to disqualify Spence's counsel and then granted Hustler's motion for summary judgment against Spence upon his defamation claim for damages.

We reverse the summary judgment and affirm the order denying the motion to disqualify Spence's counsel.

Spence presents us with this statement of issues in his defamation action:

"1. Whether this Court will give full force and effect to Wyoming's Constitutional issue provision that 'the jury [has] the right to determine the facts and the law, under the direction of the court' in a libel case.

"2. Whether the publication about Spence was false and defamatory, and was published 'with good intent and [for] justifiable ends?'

"3. Whether the publication was protected 'opinion' and whether that question ought to have been presented to the jury for determination."

In response, Hustler asserts:

"1. Whether summary judgment was improper under Article I, Section 20 of the Wyoming Constitution.

"a. Whether Article I, Section 20 forbids summary judgment in a libel action.

"b. Whether the court's responsibility under the First Amendment to grant

summary judgment on constitutional issues can be superseded by a provision of the state constitution.

"2. Whether the statements about plaintiff Gerry Spence were constitutionally protected statements of opinion.

"3. Whether Spence met his burden of proving the statements about him were false.

"4. Whether Spence, a public figure, met his burden of coming forward with clear and convincing proof that defendants published falsehoods about him with knowledge that they were false or with a subjective awareness of probable falsity.

"5. Whether Spence's admission that he suffered no reputational harm required dismissal of his libel suit."

Spence's lawsuit against Hustler seeking damages for defamation was precipitated by an article which appeared in the July 1985 issue of Hustler magazine. Shortly before the article was printed, Spence had filed a number of legal actions against Hustler on behalf of clients including Andrea Dworkin. The article or "column," however it might best be characterized, was this:

"Many of the vermin-infested turd dispensers we name Asshole of the Month are members of that group of parasitic scum-suckers often referred to as lawyers. These shameless shitholes (whose main allegiance is to money) are eager to sell out their personal values, truth, justice and our hard-won freedoms for a chance to fatten their wallets. The latest of these hemorrhoidal types to make this page is Jackson, Wyoming, attorney Gerry Spence, our Asshole of the Month for July.

"Spence dudes himself up in western duds and calls himself a 'country lawyer,' but the log-cabin image is as phony as a cum-dripping whore's claim of virginity: This reeking rectum is worth millions and owns a 35,000 acre ranch. Spence's claim to fame is that in the name of 'the little guy' he's won some mighty big judgments * * *. He'd like to add HUSTLER to the list ... for a whopping $150 million. His client is 'little guy' militant lesbian feminist Andrea Dworkin, a shit-squeezing sphincter in her own right. In her latest publicity-grab, Dworkin has decided to sue HUSTLER for invasion of privacy among other things.

"Dworkin seems to be an odd bedfellow for 'just folks,' 'family values' Spence. After all, Dworkin is one of the most foul-mouthed, abrasive manhaters on Earth. In fact, when Indianapolis contemplated an antiporn ordinance co-authored by Dworkin, she was asked by its supporters to stay away for fear her repulsive presence would kill the statute. Spence, however, can demand as much as 50% of the take from his cases. And a possible $75 million would buy a lot of country for this lawyer. Considering that Dworkin advocates bestiality, incest and sex with children, it appears Gerry 'This Tongue for Hire' Spence is more interested in promoting his bank account than the traditional values he'd like us to believe he cherishes.

"This case is nuisance suit initiated by Dworkin, a cry-baby who can dish out criticism but clearly can't take it. The real issue is freedom of speech, something we believe even Dworkin is entitled to, but which she would deny to anyone who doesn't share her views. Any attack on First Amendment freedoms is harmful to all ... Spence's foaming-at-the-mouth client especially. You'd think someone of Spence's stature would know better than to team up with a censor like Dworkin. Obviously, the putrid amber spray of diarrhea known as greed has clouded this Asshole's senses." (emphasis in original)

 At the outset we must agree with Hustler that Article 1, § 20 of the Wyoming Constitution does not provide an avenue of relief that supersedes well-established First Amendment law in cases such as this. The United States Constitution, as interpreted by the United States Supreme Court, is the supreme law of the land. This is recognized in our own state constitution. Wyo. Const., Art. 1, § 37. We do not agree that Art. 1, § 20 absolutely guar-

antees a plaintiff a trial to a jury in a defamation case. *Spriggs v. Cheyenne Newspapers*, 63 Wyo. 416, 182 P.2d 801, 804–09 (1947); *see Tschirgi v. Lander Wyoming State Journal*, 706 P.2d 1116 (Wyo. 1985).

The district court relied heavily upon the case *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) in granting summary judgment in favor of Hustler in this case. The United States Supreme Court said in that case:

> "We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue [which was similar in gutter language to that in this case] without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,' *i.e.*, with knowledge that the statement was false or with reckless disregard as to whether or not it was true. This is not merely a 'blind application' of the *New York Times* standard, *see Time, Inc. v. Hill*, 385 U.S. 374, 390, 87 S.Ct. 534, 543, 17 L.Ed.2d 456 (1967), it reflects our considered judgment that such a standard is necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment.
>
> "Here it is clear that respondent Falwell is a 'public figure' for purposes of First Amendment law. *The jury found against respondent* on his libel claim when it decided that the Hustler ad parody could not 'reasonably be understood as describing actual facts about [respondent] or actual events in which [he] participated.' * * * The Court of Appeals interpreted the jury's finding to be that the ad parody 'was not reasonably believable,' * * * and in accordance with our custom we accept this finding. Respondent is thus relegated to his claim for damages awarded by the jury for the intentional infliction of emotional distress by 'outrageous' conduct. But for reasons heretofore stated this claim cannot, consistently with the First Amendment, form a basis for the award of damages when the conduct in question is the publication of a caricature such as the ad parody involved here." *Hustler*, 485 U.S. at 57, 108 S.Ct. at 882–83 (emphasis added).

We first observe that development of the law of defamation has moved along a strange path to a place where we now say that the more outrageous, vile, vulgar, humiliating and ridiculous the publication, the more it is protected. It may subject another to enormous ridicule and be more personal and hurtful than much recognized defamation, but if it is outrageous enough, it is "all right." Thus, it is "all right" to publish that Falwell had sex in an outhouse with his mother, but not "all right" to publish that Falwell had sex with a church member. Both publications state facts, both are defamatory; one would cause ridicule, perhaps contempt, the other hatred and contempt. It is said that one publication is believable, the other not; and so no matter what the ridicule, hurt and damage, the court held Falwell without a remedy. It is said that this is "imaginative expression"—"rhetorical hyperbole." The *Falwell* case states the law, and we accept it as such. But the *Spence* case is different. Spence is acting on behalf of another, arguably without personal involvement. As applied to Spence, there ought to be, and there is, a limit. It is fair comment on matters of public concern.

We do not perceive the holding enunciated in the *Falwell* case to be dispositive of the issue raised by Spence in his complaint, and we are convinced that, as Falwell was allowed to present his case to a jury, so is Spence entitled to have his theories of recovery presented to a jury for consideration. In the *Falwell* decision, the Supreme Court noted that the First Amendment freedoms that were discussed throughout that opinion are subject to limitations. In the case *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942), the United States Supreme Court noted that:

> "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitu-

tional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that *such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth* that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.'" (emphasis added and footnotes omitted)

Although not directly in point, the quoted language in *Chaplinsky* intimates that an individual is entitled to maintain an action for redress of the kind of grossly defamatory statements as those at issue here. *Milkovich v. Lorain Journal Co.,* — U.S. ——, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) furthers development of that stated in *Chaplinsky,* tracing the law of defamation in a concise, easily read and understood fashion. It is the most important decision in this area of law since *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964) and *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). First, the Court directly confronted the question whether there is "a constitutionally-required 'opinion' exception to the application of defamation laws." It laid to rest the absurd notion that anything published that is couched in opinion language cannot be defamation for which damages are recoverable when it said:

"[W]e think the ' "breathing space" ' which ' "freedoms of expression require in order to survive," ' [*Philadelphia Newspapers, Inc. v.*] *Hepps,* 475 U.S. [767], at 772, 106 S.Ct. [1558], at 1561 [89 L.Ed.2d 783 (1986) ] (quoting *New York Times,* 376 U.S., at 272, 84 S.Ct., at 721), is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between 'opinion'

and fact." *Milkovich,* — U.S. at ——, 110 S.Ct. at 2706.

Supporting this conclusion, the Court cites Restatement, Second, Torts § 566, comment (a) (1977):

"Under the law of defamation, an expression of opinion could be defamatory if the expression was sufficiently derogatory of another as to cause harm to his reputation, so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. * * * The expression of opinion was also actionable in a suit for defamation, despite the normal requirement that the communication be false as well as defamatory. * * * This position was maintained even though the truth or falsity of an opinion—as distinguished from a statement of fact—is not a matter that can be objectively determined and truth is a complete defense to a suit for defamation."

To lessen the burden of defamatory expression of opinion,

" '[t]he principle of "fair comment" afford[ed] legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact.' 1 F. Harper & F. James, *Law of Torts* § 5.28, p. 456 (1956) (footnote omitted). As this statement implies, comment was generally privileged when it concerned a matter of public concern, was upon true or privileged facts, represented the actual opinion of the speaker, and was not made solely for the purpose of causing harm." *Milkovich,* — U.S. at ——, 110 S.Ct. at 2703.

Was Hustler exercising a privilege of "fair comment" for an honest expression of opinion, on a matter of public concern, when Hustler stated that Spence was a "vermin-infested turd dispenser," a "parasitic scum-sucker," a "shameless shithole," a "reeking rectum," a "hemorrhoidal type" and "Asshole of the Month for July?" Was that publication made solely for the purpose of causing harm? It is at least questionable whether that was fair comment on a matter of public concern not

made solely for the purpose of causing harm. And the claim that Spence sold out his personal values for a chance to "fatten his wallet" with a "possible $75 million" may be a false statement of fact, for it appears that Spence may be able to prove that he stands personally to gain nothing monetarily from this litigation since it appears that Spence may have assigned all of his recovery to a charitable organization to provide pro bono legal services to the poor and disadvantaged.

The statements by Hustler about Spence are clearly defamatory, for they are such as would hold him up to *hatred, contempt or ridicule*. Unless they are protected defamatory criticism of a public figure, they are actionable, and Spence should be allowed to pursue his claim.

■■■ A public figure is not subject to defamatory attack and criticism just because he is a public figure. In other words, Larry Flynt is not free to arise each morning and select a public figure to attack and defame for no reason at all. The public figure subject to defamatory criticism is one who is involved in the resolution of important public questions or who by reason of fame shapes events in areas of concern to society, *Curtis Publishing v. Butts*, 388 U.S. 130, 164, 87 S.Ct. 1975, 1996 (Warren, C.J., concurring), and who injects himself into the vortex of a controversy. The controversy here involved is Dworkin's fight against pornography. Hustler's argument is structured upon the proposition that Spence has taken up the fight against pornography, thrust himself into the controversy as a public figure, and is therefore subject to response by persons taking the other side. Spence may or may not, in fact, be personally opposed to pornography. That fact is not disclosed by the record in this case. What is disclosed by the record is that, under the circumstances presented here, he appears only to be representing a client who is fighting pornography and is on her side only in the sense that he is providing professional services to her. Thus, if Spence engaged in this controversy beyond the confines of the litigation, he may be subject to appropriate de-

famatory criticism—fair comment upon a matter of public concern. If, however, he did no more than represent his client in her litigation against Hustler, there is no constitutional opinion privilege for these defamatory publications. At least that is a subject of dispute between the parties and cannot be decided at the summary judgment stage of the proceedings.

■ It seems reasonable also that Spence might be a public figure in some situations and a private person in others. While it is admitted by all that Spence is a public figure, at least for some purposes, it may develop in trial that Spence was not a "public figure" for his role as a lawyer representing Dworkin which led to the allegedly defamatory publication. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 757–63, 105 S.Ct. 2939, 2944–47, 86 L.Ed.2d 593 (1985); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351–52, 94 S.Ct. 2997, 3012–13, 41 L.Ed.2d 789 (1974); and *see generally* 35 Words and Phrases, "Public Figure" (1963). To be the public figure whom publishers are privileged to defame, absent malice, the party must at least have been involved in the public controversy before the defamatory statement was published. *Hutchinson v. Proxmire*, 443 U.S. 111, 134–35, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979); *Vern Sims Ford, Inc. v. Hagel*, 42 Wash.App. 675, 713 P.2d 736, 739 (1986). Hustler relies in part for its characterization of Spence as a "public figure" upon the publication of Spence's books, especially *Trial by Fire* (concerning a case of his against Penthouse magazine) which was not published until 1986 and a second book *And Justice for None* which was not published until 1989. Thus, in 1985, at the time the Hustler article was published, Spence may not have been a "public figure" for First Amendment purposes who had entered the fight against pornography as Hustler claims.

A professional person, who may be a "public figure" for some purposes, should be free to offer his services to a client as a private professional without being subjected to public figure defamation. To hold

otherwise would have a chilling effect upon attorneys who undertake to represent clients in difficult, unpopular, high profile, or sensational types of cases. We can foresee also detriment to these potential clients being unable to employ skilled, capable, specialist lawyers who have achieved some fame and reputation because of their legal and trial abilities and are claimed to have achieved public figure status. Under these circumstances, we hold that a person situated, as Spence is here, is not subject to defamation without recourse. We see no threat to the principles of the First Amendment which we, as a court of last resort, have upheld with great vigor; but there must, as the United States Supreme Court has itself held, be some balance between Freedom of Speech and Press and other interests of constitutional proportions which are of equal importance. Free speech cannot equate with the freedom to intimidate, destroy and defame an advocate seeking to represent a client.

■ In summary, our review of the propriety of summary judgment is well-established. *Case v. Goss,* 776 P.2d. 188, 190–91 (Wyo.1989). In this case the district court granted summary judgment on the basis of the pleadings alone. *See, Cordova v. Gosar,* 719 P.2d. 625 (Wyo.1986). Spence agreed that he was a public figure, and he may be for some purposes. He is not, however, a public figure if his involvement in the controversy is only as a lawyer representing a client. Although we decide this case on grounds not fully briefed or argued to the court, we have held on several occasions that we may decide a case on any ground that justice requires. *White v. Fisher,* 689 P.2d 102, 105 (Wyo.1984). On remand, the parties will have ample opportunity to establish whether Spence is a public or private figure. Thus, our holding is that a lawyer who is merely advocating for a famous or controversial client is not a public figure merely because he has taken on the cause as advocate. We hold that there is not a special opinion privilege, and, under the circumstances of this case and the principles enunciated in *Gertz,* 418 U.S. 323, 94 S.Ct. 2997, and *Milkovich,* — U.S.

—, 110 S.Ct. 2695, Spence may have his day in court.

We next address Hustler's cross-appeal in which these issues concerning disqualification of Spence's counsel are presented:

"1. Whether an attorney's filing of a lawsuit for libel and related torts based upon an alleged charge of unprofessional and unethical conduct renders that lawyer's partners and associates likely witnesses as to the truth or falsity of the challenged statement.

"2. Whether an attorney's filing of a lawsuit for libel and related torts based upon an alleged charge of unprofessional and unethical conduct renders that lawyer's partners and associates likely witnesses as to the existence of any reputational harm allegedly suffered by the lawyer.

"3. Whether an attorney's filing of a lawsuit for intentional infliction of emotional distress renders that lawyer's partners and associates likely witnesses as to the nature and severity of the alleged emotional distress.

"4. Whether a lawyer's partners and associates must be disqualified from representation of the lawyer, pursuant to Rule 3.7 of the Wyoming Rules of Professional Conduct, when those partners and associates are likely to be called as witnesses in the case."

Spence's response to these arguments is this:

"1. Whether Gary L. Shockey, partner of Gerry L. Spence, may act as Mr. Spence's counsel, pursuant to the authority in Rule 3.7, Wyoming Rules of Professional Conduct for Attorneys at Law, which provides, in part, that 'A lawyer may act as an advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness [unless precluded from doing so by Rule 1.7 or Rule 1.9].'

"2. Whether other members of Mr. Spence's firm may be witnesses.

"3. Whether [Hustler has] utterly failed to make necessary evidentiary showings with respect to issues 1 and 2."

Hustler contends that Spence needs to call as witnesses members of the firm, including Shockey. The areas in which Hustler contends that the firm members' testimony is needed include the truth or falsity of challenged published statements, whether Spence suffered any reputational harm, and the nature and severity of any emotional distress. Because of this alleged need, Hustler contends that Shockey cannot continue as Spence's trial counsel.

Determination of this issue is governed by Rules of Professional Conduct for Attorneys at Law, Rule 3.7, which became effective on January 12, 1987. Rule 3.7 provides:

"(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
"(1) the testimony relates to an uncontested issue;
"(2) the testimony relates to the nature and value of legal services rendered in the case; or
"(3) disqualification of the lawyer would work substantial hardship on the client.
"(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9."

Rules 1.7 and 1.9 pertain to conflict of interest between lawyers and their clients and between lawyers and their former clients. Hustler concedes that no conflicts of interest under those rules exist here. One function of Rule 3.7(b) is to make clear that 3.7(a) is personal to the client's trial advocate and will not be imputed to other members of the firm. 1 G. Hazard & . W. Hodes, *Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* 684 (1990). Without a conflict of interest, Rule 3.7(b) does not enter into the issue of whether Shockey may continue as counsel regardless of whether other members of the firm will testify. Therefore, we conclude that Rule 3.7(b) has no application to the facts of this case.

Rule 3.7 superseded Disciplinary Rules 5–101(B) and 5–102 when this court adopted the Rules of Professional Conduct, replacing the Code of Professional Responsibility. DR 5–101(B) stated:

"A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:
"(1) If the testimony will relate solely to an uncontested matter.
"(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
"(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.
"(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case."

DR 5–102 stated:

"(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).
"(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client."

The Code of Professional Responsibility might have mandated disqualification, but that is an issue we need not consider here. The new Rules of Professional Conduct, which govern this case, are less restrictive than the code in this area.

ABA/BNA Lawyer's Manual on Professional Conduct 61:501 (1989). *See* Wydick, *Trial Counsel as Witness: The Code and The Model Rules*, 15 U.C.Davis L.Rev. 651 (1982). Although Rule 3.7 recognizes the threat of prejudice against the opposing party when the roles of trial advocate and witness are combined, one of the goals of the rule is to minimize the use of the rule as a tactical weapon by adversary counsel. Wyoming Rules of Professional Conduct Rule 3.7, comments 1, 2; Wydick, 15 U.C.Davis L.Rev. at 677. Rule 3.7 protects the right of a party to counsel of his choice. *Security General Life Ins. Co. v. Superior Court*, 149 Ariz. 332, 718 P.2d 985, 988 (1986). Disqualification motions are " 'often simply common tools of the ligation process * * * used * * * for purely strategic purposes.' " *McElroy v. Gaffney*, 129 N.H. 382, 529 A.2d 889, 894 (1987) (quoting Van Graafeiland, *Lawyer's Conflict of Interest—A Judge's View* (Part II), N.Y.L.J. July 20, 1977 at 1, col. 2). Such motions to disqualify chosen counsel are disfavored, especially when the motion is based on what another party ought to do in choosing its witnesses for trial. *Mitts & Merrill, Inc. v. Shred Pax Corp.*, 112 F.R.D. 349, 353–54 (N.D.Ill.1986). Hustler's motion to disqualify Shockey and other members of the Spence, Moriarity & Schuster law firm is for all appearances just such a diversionary motion.

Furthermore, Hustler has made no showing that Shockey is "likely to be a necessary witness" as Rule 3.7(a) requires. Simply to assert that the attorney will be called as a witness is not enough. *Humphrey on behalf of State v. McLaren*, 402 N.W.2d 535, 541 (Minn.1987). If the evidence can be produced in some other effective way, the attorney is not a necessary witness. *Id.* Thus, Hustler's own argument that other members of the firm can be called to testify to the matters to which Shockey can testify defeats the contention that Shockey is a necessary witness. For these reasons, we affirm the order of the district court denying Hustler's motion to disqualify Shockey, as well as other members of the Spence firm.

The order of the district court granting summary judgment to Hustler is reversed and remanded to the district court for further proceedings consistent with this opinion. The order of the district court refusing to disqualify members of the Spence firm from representing Spence in the prosecution of this action is affirmed.

THOMAS, J., files a specially concurring opinion.

MACY and GOLDEN, JJ., file separate opinions concurring in part and dissenting in part.

THOMAS, Justice, concurring specially.

I agree that the order of the district court granting summary judgment to the appellees in this case must be reversed. I am satisfied that the order of the district court refusing to disqualify members of the Spence firm from representing Spence should be affirmed. I cannot, however, join the rationale for reversal represented by the holding that Spence is not a "public figure" merely because his role in the predicate to the allegedly defamatory publication was that of a legal advocate. That is precisely the role that results in Spence being a "public figure," and it is clear that, both in the trial court and in his argument to this court, Spence stipulated and conceded that he is, indeed, a "public figure."

Even so, there exists ample justification to reverse the summary judgment entered by the trial court. The philosophical question posed in this case is whether the First Amendment to the Constitution of the United States constitutes a universal smile sufficient to ward off the Virginian's unholstered pistol.[1] In this instance, the legal

---

1. In *The Virginian*, his classic novel about the American cowboy and life in the West, Owen Wister incorporates this marvelous vignette:

 " * * * Through folding doors I passed from the bar proper with its bottles and elk head back to the hall with its various tables. I saw a man sliding cards from a case, and across the table from him another man laying counters down. Near by was a second dealer pulling cards from the bottom of a pack, and opposite him a solemn old rustic piling and

issue tracks the philosophical question, and there is nothing in the record to indicate that Hustler was "smiling." Is one entitled, as a matter of law, to impugn another with whatever lewd, obscene, and profane vilification, revilement, defilement, or slur one chooses by virtue of the right of free speech embraced by the First Amendment to the Constitution of the United States and Article 1, Section 20 of the Constitution of the State of Wyoming? The district court answered "Yes" to that question by granting the motion for summary judgment presented on behalf of the appellees. Our answer appropriately can be "No."

Words, such as those published in this case, indeed *"are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942) (emphasis added). The implication of the *Chaplinsky* holding is that the full range of constitutional protection does not extend to such expressions as this record discloses. Whether, however, a defense to the claims of defamation or intentional infliction of emotional distress can be premised upon the right to publish an opinion depends, in an instance such as this, upon a determination that the statement is one of opinion rather than one of fact, just as the decision in *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), depended upon whether, in fact, the statement was parody rather than fact. The issue is one that appropriately should be resolved by a jury, and thus summary judgment is not appropriate.

I add only the suggestion that in an instance such as this, in which the only

> changing coins upon the cards which lay already exposed.
>
> "But now I heard a voice that drew my eyes to the far corner of the room.
>
> " 'Why didn't you stay in Arizona?'
>
> "Harmless looking words as I write them down here. Yet at the sound of them I noticed the eyes of the others directed to that corner. What answer was given to them I did not hear, nor did I see who spoke. Then came another remark.
>
> " 'Well, Arizona's no place for amatures.'
>
> "This time the two card dealers that I stood near began to give a part of their attention to the group that sat in the corner. There was in me a desire to leave this room. So far my hours at Medicine Bow had seemed to glide beneath a sunshine of merriment, of easygoing jocularity. This was suddenly gone, like the wind changing to north in the middle of a warm day. But I stayed, being ashamed to go.
>
> "Five or six players sat over in the corner at a round table where counters were piled. Their eyes were close upon their cards, and one seemed to be dealing a card at a time to each, with pauses and betting between. Steve was there and the Virginian; the others were new faces.
>
> " 'No place for amatures,' repeated the voice; and now I saw that it was the dealer's. There was in his countenance the same ugliness that his words conveyed.
>
> " 'Who's that talkin'?' said one of the men near me, in a low voice.
>
> " 'Trampas.'
>
> " 'What's he?'
>
> " 'Cow-puncher, bronco-buster, tin-horn, most anything.'
>
> " 'Who's he talkin' at?'
>
> " 'Think it's the black-headed guy he's talking at.'
>
> " 'That ain't supposed to be safe, is it?'
>
> " 'Guess we're all goin' to find out in a few minutes.'
>
> " 'Been trouble between 'em?'
>
> " 'They've not met before. Trampas don't enjoy losin' to a stranger.'
>
> " 'Fello's from Arizona, yu' say?'
>
> " 'No. Virginia. He's recently back from havin' a look at Arizona. Went down there last year for a change. Works for the Sunk Creek outfit.' And then the dealer lowered his voice still further and said something in the other man's ear, causing him to grin. After which both of them looked at me.
>
> "There had been silence over in the corner; but now the man Trampas spoke again.
>
> " '**And** ten,' said he, sliding out some chips from before him. Very strange it was to hear him, how he contrived to make those words a personal taunt. The Virginian was looking at his cards. He might have been deaf.
>
> " '**And** twenty,' said the next player, easily.
>
> "The next threw his cards down.
>
> "It was now the Virginian's turn to bet, or leave the game, and he did not speak at once.
>
> "Therefore, Trampas spoke. 'Your bet, you son-of-a——.'
>
> "The Virginian's pistol came out, and his hand lay on the table, holding it unaimed. And with a voice as gentle as ever, the voice that sounded almost like a caress, but drawling a very little more than usual, so that there was almost a space between each word, he issued his orders to the man Trampas:—
>
> " 'When you call me that, **smile!** ' " Wister, *The Virginian* (1902) (emphasis in original).

purpose of the published language is to inflict injury or offer insult, true malice is present. Concededly, this is not the technical sort of actual malice that is described as actual knowledge of falsehood or reckless disregard of the truth in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), but that definition relates to what purport to be statements of fact. When the claim that the statement is an expression of opinion is injected, that technical definition of "actual malice" may no longer pertain, and the traditional definition of malice, i.e., the intention or desire to harm another, may be invoked. If the latter definition is applicable, there should be no necessity to determine whether the object of the published comment is a public figure. There is no newsworthy value of such expressions of opinion.

MACY, Justice, concurring in part and dissenting in part.

I concur in the decision to affirm the order denying the motion to disqualify Spence's counsel and the decision to reverse the summary judgment. I disagree, however, with the majority's analysis regarding the alleged defamatory statements and propose an alternate guideline for the district court.

Actionable and Nonactionable Statements

With respect to the question of whether the statements in the published article are actionable, I agree with most of Justice Golden's analysis. I part company, however, at the point where he determines, as a matter of law, that all the statements are nonactionable opinion or rhetorical hyperbole. *See* 816 P.2d at 790 (Golden, J., concurring in part and dissenting in part). This case should be remanded for a factual determination of whether some of the statements are actionable factual assertions. If those statements are statements of opinion relating to matters of public concern which contain a provably false factual connotation and if they can reasonably be interpreted as stating actual facts, then they are actionable factual assertions.

*Milkovich v. Lorain Journal Co.,* —— U.S. ——, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Otherwise, the statements are nonactionable opinion or rhetorical hyperbole.

While the United States Supreme Court has not declared that the determination of whether a statement is an actionable factual assertion or a protected opinion is a question of law or a question of fact, several courts have utilized principles articulated by the Supreme Court to hold that *close calls* should be turned over to a fact finder. *Yetman v. English,* 168 Ariz. 71, 811 P.2d 323 (1991); *Flotech, Inc. v. E.I. Du Pont de Nemours & Company,* 814 F.2d 775 (1st Cir.1987); *Aldoupolis v. Globe Newspaper Company,* 398 Mass. 731, 500 N.E.2d 794 (1986); *Good Government Group of Seal Beach, Inc. v. Superior Court of Los Angeles County,* 22 Cal.3d 672, 150 Cal.Rptr. 258, 586 P.2d 572 (1978). In *Yetman,* 811 P.2d at 331, the Arizona Supreme Court stated:

[O]nly in the clearest cases may courts, applying the principles laid down in *Milkovich,* determine as a matter of law that the assertions before them state or imply actual facts and are therefore entitled to no constitutional protection. *See White v. Fraternal Order of Police,* 909 F.2d 512, 523 (D.C.Cir.1990); *Beasley v. St. Mary's Hosp.,* 200 Ill.App.3d 1024, 146 Ill.Dec. 714, 720, 558 N.E.2d 677, 683 (1990). In other cases, it will be clear that the assertions at issue employ "loose, figurative or hyperbolic language," and cannot reasonably be interpreted as stating or implying actual facts.

The court held that, in cases involving statements to which reasonable people might give conflicting yet plausible interpretations, a fact finder should determine the nature of the statements. *Id.*

Under the Arizona Supreme Court's standard, Hustler's article must be analyzed to determine which statements are, as a matter of law, either protected or unprotected and which statements should be examined by a fact finder. Justice Golden lays out the following four-prong test which governs that determination:

1. The full context of the statements in the article since other unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content;

2. The broad social context or setting within which the allegedly defamatory statement appears;

3. The common usage or meaning of the specific language of the challenged statements;

4. Whether the statement is capable of being verified, that is, objectively characterized as true or false.

816 P.2d at 785 (Golden, J., concurring in part and dissenting in part). Applying that test, I agree with Justice Golden's conclusion that "vermin-infested turd dispensers," "shameless shitholes," "hemorrhoidal types," "[a]sshole," "reeking rectum," and "parasitic scum-suckers" are either expressions of opinion or rhetorical hyperbole. The statement, "In her latest publicity-grab, Dworkin has decided to sue HUSTLER," is not directed toward Spence and, therefore, is not relevant to his case.

The character of the following statements is not clear and should be determined by a fact finder:

1. Spence is a lawyer and lawyers "are eager to sell out their personal values, truth, justice and our hard-won freedoms for a chance to fatten their wallets."

2. Spence's "log-cabin image is * * * phony."

3. "Spence is more interested in promoting his bank account than the traditional values he'd like us to believe he cherishes."

4. "This case is a nuisance suit initiated by Dworkin."

A reasonable jury could conclude that statements 1, 2, and 3 imply that Spence intentionally deceives the legal system for monetary gain. Such a conclusion would give rise to an actionable assertion of fact. The same jury could also decide that those statements do not suggest the existence of provable facts or that they are merely rhetorical hyperboles which disparage Spence.

In that case, the statements would be protected. Statement 4 is a problem because it refers to Dworkin's suit as a "nuisance suit." While some readers may not consider that phrase in terms of professional ethics, an attorney who files a nuisance suit can be punished pursuant to Rule 3.1 of Wyoming's Rules of Professional Conduct for Attorneys at Law. Hence, the filing of a nuisance suit can be a provable fact, and a reasonable jury could conclude that statement 4 connotes the existence of such a fact. In contrast, a reasonable jury could also find that Hustler's statement is simply an expression of its opinion that Dworkin is not entitled to a recovery and not an assertion that Spence committed an ethical violation. I would send all four statements back to the district court for a factual determination of their character.

### Spence's Status as a Public Figure

The majority opinion concludes that the issue of whether Spence is a public figure or a private individual should be remanded for a determination by a fact finder. 816 P.2d at 776. I agree with that conclusion and emphasize that a lawyer should not be deemed a public figure just because he takes on a notorious case or represents a client who is a public figure. I also write to advocate for the use of a standard—when addressing the public figure versus private individual issue—similar to the standard expressed in the previous section of this opinion. In cases which, under the principles enunciated in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), involve a person who is clearly a public figure or a private individual, the court may determine the person's status as a matter of law. *See Adams v. Frontier Broadcasting Company*, 555 P.2d 556 (Wyo.1976). Otherwise, the factual question should be presented to and decided by a fact finder.

GOLDEN, Justice, concurring in part and dissenting in part.

Although I concur in this court's affirmance of the trial court's order denying *Hustler's* motion to disqualify Spence's

counsel, I dissent to that part of the majority's opinion which reverses the trial court's order granting *Hustler's* motion for summary judgment.

The district court applied controlling authority and held correctly as a matter of law the *Hustler* article was not defamatory. The majority purports to remand in light of *Milkovich v. Lorain Journal,* —— U.S. ——, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Yet, despite its acknowledgment that the "United States Constitution, as interpreted by the United States Supreme Court, is the supreme law of the land," the majority creates and applies an analytical framework in conflict with the federal constitutional authority restated in *Milkovich* and labels the article's contents as "clearly defamatory." With that naked assertion and the reversal and remand for "further proceedings consistent with this opinion," I am uncertain what those further proceedings should entail, and I suspect the trial court judge will also be uncertain. It appears the majority has not only reversed summary judgment for *Hustler,* but has decided the article is defamatory and strongly suggests a resolution of Spence's status for purposes of a defamation action.

I would affirm the district court's grant of summary judgment as the *Hustler* article, by application of federal constitutional authority recapitulated in *Milkovich,* is a nonactionable statement of editorial opinion which enjoys absolute protection under the first amendment of the United States Constitution. Assuming the article was not absolutely protected, I would hold that Spence is a public figure for all purposes and must provide evidence of actual malice even were he to identify any "provably false factual connotation[s]" *Milkovich,* —— U.S. at ——, 110 S.Ct. at 2706, 111 L.Ed.2d at 18, in the *Hustler* piece. He is a public figure by his own admission, by the evidence he produced during discovery, by his counsel's concessions in the trial court and in this court, and by overwhelming legal authority.

Finally, I would have dismissed with prejudice the appeal because Spence failed to include appropriate page references to the record in his statement of the facts relevant to the issues presented for review. W.R.A.P. 5.01(3). This court has previously cautioned litigants practicing before it to comply with this well-known and easily followed rule. *Jung–Leonczynska v. Steup,* 782 P.2d 578, 581 (Wyo.1989); *V–1 Oil Company v. The Honorable Robert B. Ranck,* 767 P.2d 612, 613 (Wyo.1989). This court summarily dismissed with prejudice a pro se litigant's appeal after oral argument for an identical rule violation. *Condict v. Condict,* No. 89–51, (Wyo., Jan. 24, 1990) (order dismissing appeal), *reh. denied,* Feb. 7, 1990. I see no reason for not applying the dismissal with prejudice sanction in this case. This court's failure to apply it here justifiably exposes the court to accusations of patent unfairness for employing an unwritten double standard.

I shall now flesh out my views regarding the allegedly defamatory nature of the article about Spence and his status as a public figure. Keep in mind the basic libel calculus: "statements that cannot 'reasonably be interpreted as stating actual facts'" and "statement[s] of opinion relating to matters of public concern which [do] not contain ... provably false factual connotation[s] will receive full constitutional protection." *Milkovich,* —— U.S. at ——, 110 S.Ct. at 2706, 111 L.Ed.2d at 18. If the alleged defamation is not absolutely protected by the first amendment, a "private figure" who has been allegedly libeled by the publication of a false statement of fact on a matter of public concern may recover by proving the defendant was negligent; however, a "public figure" who has been libeled by the publication of a false statement of fact on a matter of public concern may recover only by proving that the defendant published the false statement of fact either with knowledge that it was false or with reckless disregard of whether or not it was false. *Id.,* —— U.S. at ——, 110 S.Ct. at 2706–07, 111 L.Ed.2d at 19. *See also Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Old Dominion Branch No. 496, National Association of Letter Carriers, AFL–CIO v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Gertz v. Rob-*

ert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *New York Times Company v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984); *Lewis v. Time, Incorporated*, 710 F.2d 549 (9th Cir.1983); *MacGuire v. Harriscope Broadcasting*, 612 P.2d 830 (Wyo.1980); *Adams v. Frontier Broadcasting*, 555 P.2d 556 (Wyo. 1976).

## HUSTLER'S ARTICLE AS NONACTIONABLE OPINION

The majority calls *Milkovich* the most important libel law decision since the cases of *New York Times* and *Curtis Publishing*. However, it fails to analyze the *Hustler* article about Spence in light of the holding in *Milkovich* that defamation must be based on a "provably false factual connotation" and does not apply to "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich*, —— U.S. at ——, 110 S.Ct. at 2706, 111 L.Ed.2d at 19. *See, Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *Letter Carriers v. Austin;* (use of the word "traitor" in literary definition of a union "scab" was not a basis for a defamation action since word was used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members"); and *Greenbelt Cooperative*, 398 U.S. at 14, 90 S.Ct. at 1542, 26 L.Ed.2d at 15 (holding that the word "blackmail" as used to characterize a real estate developer's negotiations with a local city council for a zoning ordinance, the Court observed that "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable").

In *Milkovich*, the Supreme Court analyzed statements in a newspaper column to determine whether or not a reasonable factfinder could conclude that the headline of the article and nine passages in the article implied an assertion that wrestling coach Milkovich perjured himself in a judicial proceeding. It also addressed the "*type* of speech" at issue, reaffirming that where "loose, figurative, hyperbolic language" is used the statement cannot reasonably be interpreted as stating facts. *Milkovich*, —— U.S. at ——, 110 S.Ct. at 2707, 111 L.Ed.2d at 19. The *Milkovich* analysis relies on "the same indicia that lower courts have been relying on for the past decade or so to distinguish between statements of fact and statements of opinion: the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made." *Id.*, —— U.S. at ——, 110 S.Ct. at 2709, 111 L.Ed.2d at 21 (Brennan, J., dissenting); *see* the majority opinion —— U.S. at ——, 110 S.Ct. at 2707, 111 L.Ed.2d at 19–20, for these indicia. Inexplicably the majority eschews this principled and controlling analysis and instead creates its own methodology from the common law construct of "fair comment" and the unrelated "fighting words" doctrine of *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

*Milkovich* discusses "fair comment" as historical background, noting that it was the device used to achieve a balance of rights at common law. *Milkovich*, —— U.S. at ——, 110 S.Ct. at 2703, 111 L.Ed.2d at 14. The concept is overborne by the series of Supreme Court decisions grounded in the first amendment that began with *New York Times* and that has continued through *Milkovich*. These decisions have enunciated and refined the federal constitutional rule that displaces state common law "fair comment" out of concern that a state law "rule compelling the critic [of public figures or persons] to guarantee the truth of all his factual assertions would deter protected speech." *Milkovich*, —— U.S. at ——, 110 S.Ct. at 2703, 111 L.Ed.2d at 15. Fair comment is thus limited by "the supreme law of the land," and it is puzzling

that the majority chooses to seize on it as significant to the *Milkovich* holding.

I have equal difficulty accepting the majority's reliance on the "fighting words" doctrine from *Chaplinsky*. I strongly disagree with the majority's conclusion that *Chaplinsky* "intimates' that a civil libel action lies "for redress of the kind of grossly defamatory statements as those at issue here." In the nearly fifty years since *Chaplinsky* was decided, it has never been used by any court for that purpose. The majority opinion cannot cite to one case where that has happened. Tellingly, no United States Supreme Court case has ever "intimated" what the majority now "intimates." *Milkovich* does not once mention *Chaplinsky*, not even in a footnote.

According to the highly authoritative work, *The Constitution of the United States of America—Analysis and Interpretation*, 1099 (H. Killian & L. Beck, 1987), "Chaplinsky * * * [is] of little vitality." This work comments:

> Over the last two decades, the decided cases have reflected a fairly consistent and sustained march by the [United States Supreme] Court to the elimination of or a severe narrowing of the "two-tier" doctrine and protection of much expression that hitherto would have been held absolutely unprotected * * * fighting words, defamation, and obscenity * * *.

*Id.* at 1094–95.

Indeed that march is reflected in *Lucas, et al. v. Arkansas*, 416 U.S. 919, 94 S.Ct. 1917, 40 L.Ed.2d 277 (1974); *Eaton v. City of Tulsa*, 415 U.S. 697, 94 S.Ct. 1228, 39 L.Ed.2d 693 (1974); *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). In all of these cases various vulgar and profane epithets and insults were deemed not included within the category of "fighting words." *Chaplinsky* is clearly inapposite.

Following *Milkovich*, I believe a proper defamation analysis must address the following four factors to determine whether the statement either cannot "reasonably be interpreted as stating actual facts" or, if it is otherwise believable, contains any "provably false factual connotations:"

1. The full context of the statements in the article since other unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content;
2. The broad social context or setting within which the allegedly defamatory statement appears;
3. The common usage or meaning of the specific language of the challenged statements;
4. Whether the statement is capable of being verified, that is, objectively characterized as true or false.

In this analysis I would keep in mind Justice Holmes' epigram: "A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918) (quoted in *Ollman*, 750 F.2d at 978 n. 13).

As I begin the analysis,[1] I am reminded by Spence's appellate brief that there are only a few selected statements contained in the entire article that he complains about. I would categorize these selected statements as follows:

*The Word "Asshole" and Its Variations*
- "vermin-infested turd dispenser"
- "shameless shitholes"
- "hemorrhoidal types"
- "reeking rectum"

*Abusive Words*
- "Members of that group of parasitic scum-suckers often referred to as lawyers."

*Alleged False Statements of Fact*
- Spence is a lawyer and lawyers "are eager to sell out their personal values,

---

1. The subject matter of our analysis, the allegedly defamatory article, is appended to this dis-

sent in the form in which the article appeared.

truth, justice and our hard-won freedoms for a chance to fatten their wallets."

• His "log-cabin image is as phony as a cum-dripping whore's claim of virginity."

• ["Considering that Dworkin advocates bestiality, incest and sex with children,] it appears * * * Spence is more interested in promoting his bank account than the traditional values he'd like us to believe he cherishes."

• "In her latest publicity-grab, Dworkin has decided to sue *Hustler* * * *."

• "This case is a nuisance suit initiated by Dworkin * * *."

Among the passages in the article that Spence does not complain about are these:

• "Spence dudes himself up in western duds and calls himself a 'country lawyer' * * *."

• He is "worth millions and owns a 35,-000 acre ranch."

• "Spence's claim to fame is that in the name of 'the little guy' he's won some mighty big judgments against some mighty big corporations: $10.5 million against Kerr–McGee (the famous Karen Silkwood case), $26.6 million against Penthouse and $52 million against McDonald's. He'd like to add *Hustler* to the list * * * for a whopping $150 million. His client is 'little' militant lesbian feminist Andrea Dworkin, a shit-squeezing sphincter in her own right * * *. Dworkin seems to be an odd bedfellow for 'just folks,' 'family values' Spence. After all, Dworkin is one of the most foul-mouthed, abrasive man-haters on earth * * *."

• "Spence, however, can demand as much as 50% of the take from his cases. And a possible $75 million would buy a lot of country for this lawyer."

• "The real issue is freedom of speech, something we believe even Dworkin is entitled to, but which she would deny to anyone who doesn't share her views. Any attack on First Amendment freedoms is harmful to all * * * Spence's foaming-at-the-mouth client especially.

You'd think someone of Spence's stature would know better than to team up with a censor like Dworkin. Obviously, the putrid amber spray of diarrhea known as *greed* has clouded this Asshole's senses."

The first question considered, and the one determined against Spence by the district court, is whether reasonable readers would interpret the *Hustler* piece as stating actual facts, or whether it would be read as "rhetorical hyberbole." This is labelled in *Milkovich* as the "*type* of speech" standard. *Milkovich,* —— U.S. at ——, 110 S.Ct. at 2704, 111 L.Ed.2d at 16. To make this determination it is necessary to consider the full context of the statements in the article, the broad social context within which those statements appear, and the common meanings of the language used.

### 1. Context of the Statement in the Article

I am convinced, as was the district court, that the average reader who reads *Hustler's* "Bits and Pieces" column on the "Asshole of the Month" award is fully aware that the statements found there are not "hard news." Readers of that magazine expect that *Hustler's* writers will make strong opinionated statements in the confines of their own publication, a well-recognized home of opinion and comment. That proposition is inherent in the very notion of a "Bits and Pieces" page which is akin to an editorial opinion page. That the article appears under that heading "Bits and Pieces" and is a regular monthly feature renders it cautionary in nature; that is, the average reader is served notice that what is said cannot be read as stating actual facts. *Ollman,* 750 F.2d at 987. The general tenor of the feature also serves to emphasize it is a vulgar "expression of contempt" and not a serious statement of fact. Its scatological litany is more like an insult hurled across a barroom or schoolyard than a statement of fact.

### 2. Broad Social Context of the Article

For nearly 2,000 years individuals have published and circulated in one form or

another sharp and biting comments on the role of lawyers. I have included a brief historical sampler:

> *Luke* 11:46, in which Jesus says: "Woe unto you also, ye lawyers, for ye lade men with burdens grievous to be borne and ye yourselves touch not the burdens with one of your fingers." Radin, *The Ancient Grudge: A Study in the Public Relations of the Legal Profession,* 32 Va.L.Rev. 734, 745–46 (1946).

> Shakespeare's Henry VI where Dick the Butcher said, "The first thing we do, let's kill all the lawyers." Radin, *supra,* at 747.

> Jonathan Swift in Chapter V of *Gulliver's Travels,* at 295–97 (Oxford ed. 1919): "[T]here was a society of men among us, bred up from their youth in the art of proving by words multiplied for the purpose, that white is black, and black is white, according as they are paid. To this society all the rest of the people are slaves. * * * In pleading they studiously avoid entering into the merits of the cause, but are loud, violent, and tedious in dwelling upon all circumstances which are not to the purpose. * * * [T]hat in all points out of their own trade, they were the most ignorant and stupid generation among us, the most despicable in common conversation, avowed enemies to all knowledge and learning, and equally disposed to pervert the general reason of mankind in every other subject of discourse, as in that of their own profession."

> Sir Thomas More, on exclusion of lawyers from his Utopia "because they are 'a sort of people, whose profession it is to disguise matters.'" R. Post, *On the Popular Image of the Lawyer: Reflections in a Dark Glass,* 75 Cal.L.Rev. 379 (1987) (quoting from T. More, *Utopia* 128 (G. Burnet Trans. 1821) (1516)).

> Samuel Coleridge's verse: "He saw a lawyer killing a viper on a dunghill hard by his own stable; And the Devil smiled, for it put him in mind of Cain and his brother Abel." Post, *supra,* at 379 n. 3 (quoting from S. Coleridge, "The Devil's Thoughts," *Complete Poetical Works* 320 (1912)).

Carl Sandburg's poem, "The Lawyers Knew Too Much," included these sentiments:

In the heels of the higgling lawyers
Too many slippery ifs and buts and howevers,
Too much herein before provided whereas,
Too many doors to go in and out of.
> When the lawyers are through
> What is there left, Bob?
> Can a Mouse Nibble at it
> And find enough to fasten a tooth in?
> Why is there always a secret singing
> When a lawyer cashes in?
> Why does a hearse horse snicker
> Hauling a lawyer away?

Radin, *supra,* at 751 n. 51 (quoting from *Smoke and Steel,* 85–86 (1921); K. Llewellyn, *The Bramble Bush* (1930)).

The contemporary lawyer's negative public image is further revealed in other articles and books. Illustrative are: Lawscope, *Public: 'Shyster' OK—If He's On Your Side,* 67 A.B.A.J. 695–96 (June 1981); Jost, *What Image Do We Deserve,* 74 A.B.A.J. 47–51 (Nov. 1988); M. Bloom, *The Trouble With Lawyers,* (1968); *Verdicts on Lawyers* (R. Nader & M. Green, 1976); and M. McCormack, *The Terrible Truth About Lawyers* (1987). Finally, I cannot avoid reference to ever popular lawyer jokes that are repeated and discussed in the journals of our profession. Sandberg favored lawyers with this joke: "Have you a criminal lawyer in this burg? We think so, but we haven't been able to prove it on him." (quoted in C. Selinger, *Criminal Lawyers' Truth: A Dialogue on Putting the Prosecution to its Proof on Behalf of Admittedly Guilty Clients,* 3 The Journal of the Legal Profession 57 (1978)). I believe this is tame comment by today's standards.

An apt analogy to the public's perception of the lawyer's role in society is found in the public's perception of the umpire's role in the great American pastime of baseball. *Parks v. Steinbrenner,* 131 A.D.2d 60, 520 N.Y.S.2d 374 (1987), was a defamation action involving "one of the most colorful of

American traditions—the razzing of the umpire." *Id.* 520 N.Y.S.2d at 375. Parks, an American League baseball umpire, alleged that George Steinbrenner, controversial former principal owner of the New York Yankees, had defamed him in a press release following a Yankee game in which Parks officiated. The press release contained such statements as: "My people tell me that he is not a capable umpire"; "He doesn't measure up"; "it was ludicrous for Parks to eject two Yankee players on plays 'he misjudges'"; "I labeled him and several of the umpires as 'scabs' because they worked during the strike"; and "he is not capable of handling his job."

In considering the historical perspective, the *Parks* court noted that harsh insults directed against the umpires are accepted commonplace occurrences in baseball. *Id.* 520 N.Y.S.2d at 376–77. Viewing Steinbrenner's press release in this historical and contemporary context, the court easily concluded that the allegedly defamatory remarks "would be perceived by the average reader as statement of opinion, and not fact." The remarks "are readily understood to be the kind of 'rhetorical hyperbole' that generally accompany the communication of displeasure at an umpire's calls." *Parks,* 520 N.Y.S.2d at 377. The court continued:

> Moreover, on its face, and from its tone, it is immediately evident that the statement represents the view of the owner of an embattled baseball team who is obviously chafing at "the team's [poor] play this season", which has been exacerbated by a weekend of injuries and ejections of players, and who is venting his frustrations in the venerated American tradition of "baiting the umpire". Indeed, even if the assertions in the statement implying that plaintiff was incompetent and biased in performing his duties were to be viewed as statements of fact, it is questionable whether they could be construed as defamatory—i.e., exposing the plaintiff to public contempt, ridicule, aversion and disgrace and inducing an evil opinion of him in the minds of right thinking persons (*Rinaldi v. Holt, Rinehart & Winston, Inc., supra,* 42 N.Y.2d [369] at

p. 370, 397 N.Y.S.2d 943, 366 N.E.2d 1299 [1977])—in light of the generally "critical" attitudes which baseball umpires, in any event, ordinarily appear to inspire in both the game's fans and its participants. *Parks,* 520 N.Y.S.2d at 377. With a few minor adjustments in the quoted material, the court might just as well be commenting on *Hustler's* statement about Spence. *Hustler's* statement represents the view of the owner of an embattled magazine that is obviously chafing at an attack on its freedom of speech by Dworkin exacerbated by the legal tactics of her attorney Spence, one of America's most skillful and flamboyant lawyers. *Hustler* is venting its frustrations in the venerated American tradition of "bashing the lawyer." In light of the generally "critical" attitudes which lawyers, especially one's opponent, ordinarily appear to inspire in litigation's participants, these statements simply cannot, as a matter of law, be construed as defamatory.

Another apt analogy is found in *Myers v. Boston Magazine Company, Inc.,* 380 Mass. 336, 403 N.E.2d 376 (1980), a case involving a defendant magazine's best and worst sports awards. The magazine bestowed its award on Myers as the "worst" sports announcer in Boston. The article stated that he was "enrolled in a course for remedial speaking." *Id.* 403 N.E.2d at 377. In holding that the article could not reasonably be understood as an assertion of fact, the court found that the article "does partake of an ancient, lively tradition of criticizing, even lampooning, performers. To sharpen the bite of his rapier, a critic may resort to caricature or rhetorical license. So long as he excludes false statements of fact from his arsenal, the Constitution will shield him." *Id.* 403 N.E.2d at 381.

Whether we care for it or not, lawyer bashing is a time honored tradition, which this article simply continues in an energetic and exceptionally vulgar "style."

### 3. Common Usage or Meaning of the Language Used

With respect to the common usage or meaning of the specific language of the

challenged statements, I would quickly dispose of those allegedly defamatory statements falling in the categories designated "The word 'asshole' and its variations" and "abusive words."[2] Under prevailing first amendment law, such abusive epithets, vulgarities and profanities are nonactionable. R. Smolla, *Law of Defamation*, § 4.03, pp. 4–9 to –10 and § 6.12[10], p. 6–52 (1989). *See* cases cited therein. Their ad hominem nature easily identifies them as rhetorical hyperbole which, as a matter of law, can not reasonably be understood as statements of fact. Consequently, they are privileged. Smolla, *supra*, § 4.04[1] at 4–11 And, from an ninety-nine year old case, "[t]he language, 'You are a God damn low-down son of a bitch,' * * * is not 'obscene and vulgar [language].' " *Shields v. State*, 89 Ga. 549, 16 S.E. 66 (1892).

These three considerations all point emphatically toward a finding that *Hustler's* attack on Spence is the sort of "loose, figurative, hyperbolic language" that can-

---

**2.** In P. Farb, *Word Play* (1974), the author first informs us that "People living in western cultures have long looked upon their verbal taboos as hallmarks of their advanced 'civilization.' " *Id.* at 78. Then, he reminds that

> [m]any scholars have concluded that prohibiting the use of taboo words is not a hallmark of refinement and civilization, but rather a wound in the body of language. When a speech community isolates certain words and designates them as taboo, it debases natural things like sexual intercourse and the bodily functions; it spreads guilt by causing people to repress words and even any references at all to the natural acts of the body these words describe; it encourages the exhibitionist, who then goes out of his way to use the taboo words; and it provides an excuse for low forms of scatological and sexual humor.

*Id.* at 82–83.

As Farb points out, "[a]ny word is an innocent collection of sounds until a community surrounds it with connotations and then decrees that it cannot be used in certain speech situations * * *." *Id.* at 91. One of the reasons people in the American speech community "talk dirty"

> is to attract attention to the speaker because of the jolting effect of obscenity in places * * * considered inappropriate. Closely related to this reason is another: to display the speaker's contempt for the standards that his society upholds. Such a speaker often regards civil speech as the behavior of those who uphold the *status quo*, whereas talking dirty is a symbol of "honest" rebellion against the power structure. Further, militants of every persuasion have shown that talking dirty is an effective rhetorical device for verbal aggression, an easy way to provoke confrontations. Finally, talking dirty is a way to sexually mock authority figures—parents, teachers, clergymen, policemen, political leaders—thereby relieving the speaker of his own feelings of inadequacy.
>
> The extremely obscene remark or joke, which is often signaled by an unusually gross and obscene vocabulary, often hides by means of laughter the speaker's anxiety about certain taboo themes in his personality or his culture.

*Id.* at 85–86.

Finally, Farb comments, "Prohibiting certain words actually elevates them in a neurotic way by encouraging the strategy of talking dirty; it endows them with titillation, shame, and a vulgarity that the things they stand for do not themselves possess." *Id.* at 94. Farb reminds us that in 1934, Allen Walker Read of the University of Chicago suggested we get rid of taboo words "in a very simple way—by using the words." *Id.* Perhaps Read was prophetic. Consider Justice Powell's observation that:

> It may well be, in view of contemporary standards as to the use of vulgar and even profane language, that this particular petitioner had no reason to believe that this expletive ["chicken shit"] would be offensive or in any way disruptive of proper courtroom decorum. Language likely to offend the sensibility of some listeners is now fairly commonplace in many social gatherings as well as in public performances.

*Eaton v. City of Tulsa*, 415 U.S. 697, 700, 94 S.Ct. 1228, 1231, 39 L.Ed.2d 693, 696–97 (1974) (Powell, J., concurring opinion). And, further, consider *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) ("Fuck the Draft" emblem on jacket worn into federal courtroom) and *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (because of its content of patently offensive "seven dirty words," the government may regulate a radio broadcast, but in a different context, such as a writing, the government probably may not regulate those words.) In *Pacifica*, the majority held that the F.C.C. can regulate "the pig that has entered the parlor," referring to radio waves unsuspectingly intruding the privacy of the home where tender ears of children might hear. *Id.* 438 U.S. at 750–51, 98 S.Ct. at 3041, 57 L.Ed.2d at 1094. In contrast, with reference to Hustler's article about Spence, and with due apologies to pig farmers and pig lovers everywhere, one is tempted to observe that the "pig never left the sty" since the vulgar words appeared within the four-corners of the "farmer's" own magazine. It is hard to believe that *Hustler* magazine could unsuspectingly intrude upon the privacy of the parlor unless the parlor owner intended it to be there.

not be taken as fact. The district court based its decision on just such reasoning.

### 4. *False Statements of Fact*

Because this "award" is rhetorical hyperbole there should be no need to proceed further in reviewing this appeal. However, the majority has wandered afield, and I hasten to call after them, entreating them to return to the proper path. Assuming there is more to *Hustler's* attack than vigorous epithet, I would as readily dispose of the "alleged false statements of fact." Under that category, the statements concerning a "publicity-grab" and a "nuisance suit" are not even directed at Spence. They are plainly referring only to Dworkin. The statements call the lawsuit Dworkin's "publicity-grab" and a "nuisance suit initiated by Dworkin." Even if these statements were directed at Spence, they are not actionable. *See e.g., Camer v. Seattle Post–Intelligencer,* 45 Wash.App. 29, 723 P.2d 1195 (1986).

Also not actionable are the remaining statements that lawyers, including Spence, are eager to sell out for money, that it appears Spence is more interested in promoting his bank account, and that Spence's log-cabin image is phony. The belief that lawyers are eager to sell out for money is not new with *Hustler.* As I said earlier, such opinion has been held and expressed in a variety of ways by countless persons throughout the world for at least 2,000 years.

In connection with this "sell-out" label, the statement about Spence promoting his bank account is obviously based on the facts that he charges a fifty percent fee, has made millions, owns a large ranch, and has won big judgments in celebrated cases brought on behalf of the "little guy" in the name of "family values." The *Hustler* attack questions Spence's motive in representing a perceived "anti-family values" client like Dworkin in an effort to chill the first amendment's freedom of speech, which is obviously a "traditional value." Based on disclosed facts, *Hustler* formed and expressed an opinion that Spence took the case to make big money, fifty percent

of the $150 million for which Dworkin sued. The same analysis disposes of the statement that his log-cabin image is phony. It is obviously based on the disclosed facts that Spence is worth millions, owns a large ranch, and has won large judgments.

Stripped of the vulgarity-laden rhetorical hyperbole, *Hustler's* article expresses the simple theme that *Hustler,* a chafing defendant in a lawsuit involving the ongoing conflict between freedom of speech and pornography, does not hold a high opinion of the famous, financially successful, highly skillful opposing lawyer who usually espouses the cases of the "little guy" and "family values" against the evil forces that would take from "the little guy" the freedom of speech. In *Hustler's* opinion Spence has lost his way by representing a plaintiff who is the antithesis of "family values" and "constitutional values." I have no trouble in finding that *Hustler's* article is nonactionable opinion about a public figure on a subject of public concern.

### PUBLIC FIGURE STATUS

Here again this appeal should be resolved without discussion of the question of public figure/private person status. As the majority opens this furrow and intimates the result it believes appropriate, I am obliged to attempt to straighten its course. Spence admitted he is a public figure in response to a request for admissions during discovery. In addition, in his answers to interrogatories he stated he had written and published several books, including *Gunning for Justice* (1982). This book, according to the jacket description and a reading of its contents, is "the autobiography of a man who struggled through a painful and desolate metamorphosis to become the leading spokesman for a new system of law and lawyers for the people." The book chronicles how Spence "has fought—and won—some of the most important criminal and civil cases of our time." In the book Spence tells his reader about his *Silkwood, Cantrell, Hopkinson, and Bonnie* cases on which the spotlights of public concern and the media shone in the 1970's and 1980's. He reminds the reader that he was prosecuting attorney for Fre-

mont County from 1953–1962 and an un-successful candidate for United States Congress. Styling himself as a "country lawyer" he candidly tells his readers about his fifty percent fee, his speechmaking across the country and television appearances. His public figure stature is further documented by the list of his television appearances since January, 1984, that he produced during discovery.[3]

The district court found Spence to be a public figure based on his admitted and conceded status. There is no wonder why. Wyoming libel jurisprudence relating to public figure status is settled. *See MacGuire* and *Adams.* It mirrors federal libel jurisprudence. *Gertz; Curtis Publishing; New York Times.* If Bob Adams of *Adams* was a public figure, and this court held that he was, then so is Spence. After reviewing Adams' accomplishments, which pale in comparison to Spence's, this court allowed that, "[q]uite likely he is a public figure for all purposes and in all contexts." *Adams,* 555 P.2d at 559–62. If William M. Kunstler was held to be a public figure generally, and he was, then so is Spence. In *Ratner v. Young,* 465 F.Supp. 386 (D.V.I.1979), in determining Kunstler's status, the court noted that "Kunstler was one of the leading lawyers in the country devoting his time to the defense of members of minority groups charged with crime." The court observed that "[h]e styled himself 'an itinerant lawyer' " *Id.* at 399. The court added that Kunstler's lawyer in the motions hearing admitted that his client was a controversial figure on a national scale. *Id.* at 400. Is it overstating it to say that Spence's celebrity compares favorably with Kunstler's? I think not.

I add one final piece of evidence to make the case for Spence's public figure status. At the beginning of the oral argument of this appeal, Spence's lawyer informed this court that Spence is a public figure. He

did so in the presence of all assembled, including Spence, a standing-room-only crowd and news reporters and television cameras.[4]

Based on the record and the law, Spence has assumed a role of "special prominence in the affairs of society." He occupies a position of "such persuasive power and influence" that he is deemed a public figure for all purposes. *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. In this regard it is curious that the majority studiously avoids dealing with this status of public figure for all purposes, instead limiting its discussion to the status of limited purpose public figures.

The majority justifies its refusal to acknowledge Spence's status as a public figure by expressing concern over the need to protect advocates who are attacked merely because they represent clients embroiled in public controversies. I do not disagree with this concern, but note that such protection is the precise subject of *Gertz.* There, the Supreme Court held that Gertz, an attorney, was a private figure because "his participation related solely to his representation of a private client * * *. [H]e never discussed the * * * litigation with the press and was never quoted as having done so. He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence the outcome." *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. This standard protects most advocates, who are not public figures in their own right or have otherwise not injected themselves into the public controversy, but does not apply to Gerry Spence. It does not apply because Spence is, in the light of the evidence and his own admission, a public figure for all purposes.

If the *Hustler* feature were not considered rhetorical hyperbole, Spence, as a public figure, would have to prove that *Hustler* made false statements about him

3. The list of television appearances is included as an appendix.

4. It is noteworthy in considering Spence's status as a public figure that the media, with cameras and microphones unfurled, showed up in the

courtroom along with a large crowd. That in itself further emphasizes the public figure status of Gerry Spence. The presence of a large crowd and the media at oral arguments is very unusual.

with actual malice. "Actual malice" does *not* mean "ill will"; its legal meaning in a libel context is "with knowledge that it is false or with reckless disregard for whether it was false or not." *Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706; and *Adams,* 555 P.2d at 558. Arm waving, histrionics and speculation are not evidence. The record does not contain a showing of actual malice sufficient to defeat the motion for summary judgment.

CONCLUSION

I am disappointed that this court, which professes a tradition of expanding rights beyond the requirements of federal constitutional requirements, *See Washakie County School District No. One v. Herschler,* 606 P.2d 310 (Wyo.), *cert. den. Hot Springs County School Dist. No. One v. Washakie County School Dist. No. One,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980); *Black v. State,* (No. 90–128, circulated Dec. 14, 1990), would now attempt to constrict so fundamental a right as free speech to a level obviously below the federal constitutional floor established by Supreme Court first amendment decisions. The law is clear with respect to *Hustler's* article being nonactionable because its hyperbolic epithets cannot reasonably be considered as stating actual facts, as well as with respect to Gerry Spence's being a public figure for all purposes who has not made a showing of actual malice; the law was correctly applied by the district court.

"[N]ever send to know for whom the bell tolls; it tolls for thee," [5] not just for *Hustler.* It tolls for all who are found within the borders of this state. It tolls for every person who speaks or writes—whether in a letter to the editor of the local newspaper or a conversation over the backyard fence. It tolls for any person, young or old, professional or unskilled, educated or illiterate, who rails in polysyllabic words or, heaven forbid, the rougher four-letter variety against those who would call the tune to which the rest of us must dance.

The right to freedom of speech has frost on it today. I am compelled to dissent lest tomorrow it be entombed in ice.

---

**5.** J. Donne, "Devotion" in *The Great Thoughts* (G. Seldes comp.1985).

APPENDIX A

*Hustler* Magazine Article "Bits and Pieces"

**(alleged defamatory article)**

# ASSHOLE OF THE MONTH

## Gerry Spence

Many of the scrumptuous, tinid dispensers we name Asshole of the Month are members of that group of parasitic scum suckers often referred to as lawyers. These shameless shitholes (whose main allegiance is to money) are eager to sell out their personal values, truth, justice and our hard won freedoms for a chance to latch their wallets. The latest of these human rhoidal types to make this page is Jackson, Wyoming, attorney Gerry Spence, our Asshole of the Month for July.

Spence dudes himself up in western duds and calls himself a "country lawyer," but the log cabin image is as phony as a camel-dipping whore's claim of virginity. This reeking rectum is worth millions and owns a $5,000-acre ranch. Spence's claim to fame is that in the name of "the little guy," he's won some mighty big judgments against some mighty big corporations: $10.5 million against Kerr McGee (the famous Karen Silkwood case), $26.6 million

against *Penthouse* and $52 million against McDonald's. He'd like to add HUSTLER to the list . . . for a whopping $150 million His client is "little guy" militant lesbian feminist Andrea Dworkin, a shit-squeezing sphincter in her own right. In her latest publicity grab, Dworkin has decided to sue HUSTLER for invasion of privacy, among other things.

Dworkin seems to be an odd bedfellow for "just folks," "family values" Spence. After all, Dworkin is one of the most loudmouthed, abrasive manhaters on Earth. In fact, when Indianapolis contemplated an antiporn ordinance co-authored by Dworkin, she was asked by its supporters to stay away for fear her repulsive presence would kill the statute. Spence,

however, can demand as much as 50% of the take from his cases. And a possible $75 million could buy a lot of country for this lawyer. Considering that Dworkin advocates lesbianity, incest and sex with children, it appears Gerry "The Tongue for Hire" Spence is more interested in promoting his bank account than the traditional values he claims to believe he cherishes.

This case is a ludicrous and muddied by Dworkin's own baby, who can deny a rectum, but clearly gives a . . . The real issue is freedom of speech, something we believe even Dworkin is entitled to, but which she would deny to anyone who objects to her views. Any number of First Amendment freedoms is lethal to all . . . Spence's looming in the mouth of his capacity is, You'd think anybody of Spence's stature would know better than to team up with a cretin like Dworkin. Obviously, the putrid smell of money, known as *good*, has clouded this Asshole's senses

## APPENDIX B
### List of Television Appearances
TELEVISION APPEARANCES—GERRY SPENCE

#### Regularly Scheduled National Shows
(Network and city of origin)

60 Minutes—CBS
One on One—ABC—New York
Merv Griffin—Syndicated—Los Angeles
With Richard Hogue—Syndicated—Los Angeles
Today Show—NBC—New York
Crossfire—CNN—Washington, D.C.
David Letterman—NBC—New York
CBS Morning News—CBS—New York
Good Morning America—ABC—New York
Larry King, Live—CNN—Washington, D.C.
Take Two—CNN—New York
Media Report—CNN—New York
Kup Show—PBS—Syndicated—Chicago
Cromie's Circle—WGN—Chicago
PBS Late Night—PBS—Detroit
Nightline—ABC
CBS Evening News with Dan Rather—CBS
CNN News—CNN
PM Magazine—Syndicated

Note: This list does not include unscheduled on-the-spot interviews usually conducted in a courthouse.

#### Specials or Series—National
"The Trial of Lee Harvey Oswald"—Showtime

Viewpoint—ABC—Boston

Constitution: That Delicate Balance—Media and the Law Libel—Princeton, NJ, and Philadelphia Insanity Defense—Philadelphia Prison Reform or Victims' Rights—Columbus
CBS carried the Princeton show, PBS the rest.
Miller's Court—PBS—Boston
Portrait of America—WTBS

#### LOCAL TELEVISION SHOWS—Station and City of Origin

People Are Talking—WJZ—Baltimore
Good Day—WCVB—Boston
Weekend with Dave Finnegan—WNEV—Boston
Daytime—WSBK—Boston
Weekday—WNAC—Boston
Morning Exchange—WEWS—Cleveland
Live on Five—WEWS—Cleveland
Dave Baum Today—WMAQ—Chicago
AM Chicago—WLS—Chicago
Midday News—WMAQ—Chicago
Chicago Today—WCIU-TV—Chicago
Live at 5—KDFW—Dallas
Newsmakers—KMGH—Denver
Midday—KWGN—Denver
Alan Berg Show—KOA—Denver
Town Hall Tonight—KWGN—Denver
9 News at 6 AM—KUSA—Denver
4:30 News—KUSA—Denver

Kelly & Company—WXYZ—Detroit
Good Morning Oregon—KEZI—Eugene
Eleven News Magazine—KTVT—Fort Worth
Good Morning Houston—KTRK—Houston
Houston Live with Roger Gray—KRIV—Houston
Wake Up, Houston—KHTV—Houston
Noon News—KIDK—Idaho Falls, Idaho
Mid–Morning Los Angeles—KHJ—Los Angeles
LA at 4—KNBC—Los Angeles
MMLA—KHJ—Los Angeles
Midday News—KTTV—Los Angeles
A.M. Los Angeles—KABC—Los Angeles
Twin Cities Live—KSTP—Minneapolis
Straight Talk—WOR—Newark
Live at 5—WNBC—New York City
Newsmakers—KWTV—Oklahoma City
Newswatch Omaha—KTO—Omaha
People Are Talking—KYW—Philadelphia
Weekend Magazine—KDKA—Pittsburgh
Noon News—WTAE—Pittsburgh
Newsroom 6 at Noon—KOIN—Portland
AM Northwest—KATU—Portland
Live at Noon—KATU—Portland
Take 2—KUTV—Salt Lake City
Dimension 5—KSL—Salt Lake City
Dave Baum Today—WMAQ—Chicago
Twin Cities Live—KSTP—Minneapolis
9 News at 6 AM—KUSA—Denver
4:30 News—KUSA—Denver
MMLA—KHJ—Los Angeles
Midday News—KTTV—Los Angeles
A.M. Los Angeles—KABC—Los Angeles
People Are Talking—KPIX—San Francisco
Noon News—KPIX—San Francisco
Good Company—KING—Seattle
Noon News—KIRO—Seattle
Front Row Video—KGO—San Francisco
Live on 4—KRON—San Francisco
Northwest—KOMO—Seattle
Seattle Today—KING—Seattle
Charlie Rose Interview—WRC—Washington, D.C.
Panorama—WTTG—Washington, D.C.